# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**800 ADEPT, INC.,**

         **Plaintiff,**

**-vs-**                          **Case No.  6:02-cv-1354-Orl-28DAB**

**MUREX SECURITIES, LTD., MUREX
LICENSING CORPORATION, TARGUS
INFORMATION CORPORATION, WEST
CORPORATION,**

         **Defendants.**

_____

# ORDER

    This patent infringement action is before the Court on Defendants' (Doc. 155)[1] and Plaintiff's (Doc. 156) Objections to the Magistrate Judge's *Markman*[2] Order (Doc. 152).  The parties have responded to each other's Objections.  (Docs. 160 & 161).

    Under 28 U.S.C. § 636(b)(1)(A), a district judge may reconsider a pretrial matter decided by a magistrate judge "where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law."  The parties are in agreement that the prosecution histories of the subject patents should have been considered by the magistrate judge in

---

[1]In the alternative to their Objections, Defendants requested clarification of the *Markman* Order.  (See Doc. 155).  The magistrate judge denied the request for clarification "without prejudice to consideration by the District Judge of these arguments as part of the objections to the Order."  (Doc. 163).

[2]Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed Cir. 1995), aff'd, 517 U.S. 370 (1996).

construing the claims of the patents.  Because the magistrate judge interpreted the claims without considering the prosecution histories, the *Markman* rulings will be reconsidered.

## I.  Background

The patents at issue in this case pertain to the routing of telephone calls.  In its Amended Complaint (Doc. 4), Plaintiff 800 Adept, Inc. sets forth seven counts, and the *Markman* Order now under review pertains to the patents that are the subject of two of those counts.  In Count I, Plaintiff alleges that the Defendants have infringed two of Plaintiff's patents, Patent Nos. RE 36,111 ("the '111 Patent") and 5,805,689 ("the '689 Patent") (collectively "the Neville Patents").  And, in Count IV, Plaintiff seeks a declaratory judgment of non-infringement by Plaintiff of Patent No. 4,757,267 ("the Riskin Patent"), which is owned by Defendant Murex Licensing Corporation.

The Defendants filed several Counterclaims.  Defendant West Corporation has filed counterclaims seeking a declaratory judgment of non-infringement and invalidity of the Neville Patents.  (Doc. 18).  Additionally, Defendants Murex Securities, Ltd. and Murex Licensing Corporation have filed counterclaims alleging infringement of the Riskin Patent as well as of several other patents that are not involved in the *Markman* motions.  (Doc. 51).

Plaintiff filed a Motion for *Markman* Ruling (Doc. 61) as to claim terms in the Riskin Patent, and Defendants Murex Securities, Ltd., Murex Licensing Corporation, and Targus Information Corporation (hereinafter, collectively "Defendants") filed a Motion for *Markman* Ruling (Doc. 66) with respect to claim terms in the Neville Patents.  The *Markman* motions were referred to the assigned United States Magistrate Judge, (Docs. 69 & 70), and the

magistrate judge has issued an Order (Doc. 152) construing several terms in these patents.

The parties have filed Objections (Docs. 155 & 156) to the magistrate judge's Order and have responded to one another's Objections (Docs. 160 & 161).  In its Objections (Doc. 156), Plaintiff objects to the magistrate judge's construction of claim terms in the Riskin Patent and the Neville Patents.  On the other hand, in their Objections (Doc. 155) Defendants assert that "[i]n nearly every respect, the *Markman* Order gets the claim construction right" (Doc. 155 at 2), and Defendants do not object to the magistrate judge's construction of the subject claim terms of the Riskin Patent.  Nevertheless, Defendants do object to the Order to the extent that it construes claim terms without reference to the prosecution histories of the Neville Patents.  Defendants also seek clarification of the import of several sentences of the *Markman* Order with respect to the Neville Patents.  In the Discussion section that follows, the issue of the consideration of prosecution histories will be generally addressed, followed by discussion of the parties' specific objections to the magistrate judge's interpretations of the claim terms of the Riskin and Neville Patents.

## II.  Discussion

### A.  Consideration of Prosecution Histories

In its Objections (Doc. 156), Plaintiff argues that the magistrate judge erred in interpreting the claims of the Riskin Patent without considering the file history.  According to Plaintiff, the magistrate judge thus interpreted the claim language "in a vacuum."  (Doc. 156 at 2).  Additionally, in their Objections, Defendants – although for the most part not objecting to the magistrate judge's claim construction rulings – express concern about whether the

prosecution histories of the Neville Patents were considered in connection with the construction of the term "direct routing" in those patents.  Defendants, like Plaintiff, assert that the prosecution histories must be considered here in construing the claim terms and that "if the Markman Order is read to provide a claim construction of 'direct routing' without reference to the Neville patents' prosecution histories, it is contrary to the law."  (Doc. 155 at 15).

In discussing the established principles of claim construction, the magistrate judge quoted at length from Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576 (Fed Cir. 1996), including its statement that in construing patent claims, in addition to examining "'the words of the claims themselves'" and the specification of the patent "'the court may also consider the prosecution history of the patent, if in evidence.'"  (Doc. 152 at 5-6) (quoting Vitronics, 90 F.3d at 1582).  After a lengthy quotation from Vitronics, the magistrate judge reiterated that the court "*may* look, if necessary, to the prosecution history of the patent in suit."  (Doc. 152 at 6) (emphasis in original).

Plaintiff, however, cites several recent Federal Circuit cases for the proposition that the court *must* consider the prosecution history in construing patent claims.  (Doc. 156 at 2-3).  Defendants agree that the prosecution history must be considered.  (Doc. 155 at 12-15). The parties are correct that the prosecution history should be examined in this case in construing the claims.  In Vitronics, just prior to the lengthy excerpt quoted by the magistrate judge in the Markman order, the Federal Circuit stated:

> In determining the proper construction of a claim, the court has numerous sources that it may properly utilize for guidance.  These sources have been detailed in our previous

> opinions, . . . and include both intrinsic evidence (*e.g.*, the patent specification and file history) and extrinsic evidence (*e.g.*, expert testimony).
>
> It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history. Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language.

90 F.3d at 1582 (citing <u>Markman</u>, 52 F.3d at 979) (emphasis in original). And, in the paragraph following the passage quoted in the *Markman* order, the <u>Vitronics</u> court emphasized that competitors are entitled to review and rely on the public record, which consists of "the claims, specification, and file history," and to "apply the established rules of claim construction" to that record so that they can "ascertain the scope of the patentee's claimed invention and . . . design around" it. 90 F.3d at 1583.

Additionally, in the <u>Markman</u> decision itself, the Federal Circuit had stated:

> To construe claim language, the court should also consider the patent's prosecution history, if it is in evidence. This "undisputed public record" of proceedings in the Patent and Trademark Office is of primary significance in understanding the claims. The court has broad power to look as a matter of law to the prosecution history of the patent in order to ascertain the true meaning of language used in the patent claims:
>
> > Th[e] construction of the patent is confirmed by the avowed understanding of the patentee, expressed by him, or on his half [sic], when his application for the original patent was pending . . . . [W]hen a patent bears on its face a particular construction, inasmuch as the specification and claim are in the words of the patentee, . . . such a construction may be confirmed by what the patentee said when he was making his application.

> Although the prosecution history can and should be used to understand the language used in the claims, it too cannot "enlarge, diminish, or vary" the limitations in the claims.

52 F.3d at 980 (quoting Goodyear Dental Vulcanite Co. v. Davis, 102 U.S. 222, 227 (1880)) (citations and footnote omitted) (alterations in original); see also, e.g., AK Steel Corp. v. Sollac & Ugine, 234 F. Supp. 2d 711, 743 (S.D. Ohio 2002) ("It is error not to consider the prosecution history in interpreting the claims. The prosecution history limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution.") (citations omitted), aff'd, 344 F.3d 1234 (Fed. Cir. 2003); Rockwell Elec. Commerce Corp. v. Apropos Tech., Inc., No. 00C00054, 2002 WL 27774, at *1 (N.D. Ill. Jan. 9, 2002) ("[T]he prosecution history of the claims must be thoroughly considered when construing the claims of a patent in order to make sure that the plaintiff is not attempting to cover subject matter that was surrendered or distinguished during prosecution and because the prosecution history makes clear the patent examiner's understanding of what the inventor deemed to be patentable.") (citations omitted); 5A Donald S. Chisum, Chisum on Patents § 18.03[2], at 18-98 to 18-100 (2003) ("It is occasionally suggested that there is no need to look beyond the words of a claim if the words are clear and unambiguous. But practical experience, sound theory and the overwhelming weight of authority is to the contrary. Meaning derives from the context in which the patent claim language is used. The context includes the specification, other claims in the patent, and the record of the examination proceedings that led to the issuance of the patent ('prosecution history').") (footnotes omitted).

Thus, where it is in evidence, the prosecution history is part of the intrinsic evidence

that should be considered in claim construction.  See also C.R. Bard, Inc. v. United States Surgical Corp., 388 F.3d 858, 863 (Fed. Cir. 2004) ("[T]he ordinary and customary meaning of a term does not govern if the intrinsic record contains clear lexicography or disavowal of claim scope.").  Hence, in this case, as urged by the parties the prosecution histories of the patents will be considered in construing the claim terms.

B.  The Riskin Patent

The *Markman* Order includes interpretations of several terms from Claims 11 and 34 of the Riskin Patent.  Plaintiff argues that the prosecution history of the Riskin Patent reveals arguments that the patent owner made in order to save the claims from rejection – arguments which were accepted by the Patent Examiner in allowing the claims.  Plaintiff concedes that the restrictions in the patent language that Plaintiff urges in its proposed claim construction cannot be found in the plain language of the claims themselves, but Plaintiff avers that the restrictions offered by the owner during the patent prosecution must now be accepted by the Court in construing the claims.  (Doc. 156 at 4).

Plaintiff notes that initially, a patent was issued to Riskin based on a limited review of prior art.  Then, the Riskin patent owner requested re-examination of the patent in light of other prior art, and all claims were rejected upon reexamination.  The Riskin owner then, however, made arguments to the Examiner to distinguish Riskin from prior art in order to get some claims allowed.  Plaintiff asserts that the concessions and distinctions noted in getting the claims allowed in the first instance cannot now be retreated from in claim construction.

Claims 11 and 34 of the Riskin Patent – with deletions upon reexamination indicated

by strikeout, additions upon reexamination indicated by italics, and terminology construed in the *Markman* Order indicated by boldface type – read as follows:

11.   A method for routing a telephone call from a first party who dials a telephone number including digits uniquely characteristic of a given item to ~~a nearby~~ *one* second party out of a group of second parties who can supply said item *and who is located geographically nearest to the first party*, said method comprising the steps of:

(a)   **first routing of said call to a telephone service center;**

(b)   **determining the location of** ~~a relatively nearby~~ ***said one* second party** *based upon information associating each second party with a geographic location which is located the shortest geographic distance from the location of the first party* based ~~upon~~ *at least in part on* the telephone number dialed by said first party; and

(c)   **second routing of said call to said** ~~relatively nearby~~ ***one* second party** *who can supply said item based upon the geographic location of the second party.*

. . . .

34.   A system for placing an order for an item based upon a telephone call from a first party who dials a telephone number, including digits characteristic of said item to be delivered to a second party from a nearby third party out of a group of third parties who can supply said given items, said telephone system comprising:

**second party telephone number determining means for determining the telephone number of said second party**;

**location determining means *including information associating each third party with a geographic location* for determining the location of said nearby third party** based at least in part on the telephone number dialed by said first party; and

**routing means connected to said location determining means for routing said telephone call from said first party to said third party nearby said second party** who can supply said item *based upon the geographic location of the third party.*

(Riskin Patent, Ex. A to Doc. 64,  Reexamination Certificate col. 2 ll. 10-30; col. 3 ll. 41-60).

The magistrate judge construed several terms in these two claims.  Plaintiff objects to some

of those interpretations, and those objections are addressed in turn.

Claim 11 of Riskin:  "first routing of said call to a telephone service center"

The magistrate judge interpreted this phrase to mean "first delivering a telephone call

to a telephone service facility."  (Doc. 152 at 8).  This interpretation is similar to Defendants'

proposed construction:  "delivering a telephone call to a telephone service facility according

to an assigned path or scheduled sequence." (Joint Claim Construction Statement, Doc. 116

Ex. A at 1).  Plaintiff, on the other hand, had urged that this phrase be construed to mean

"[r]outing a call from a long distance carrier to a customer/dealer service company ('CDSC'),

which answers the call before calling a second party."  (Joint Claim Construction Statement,

Doc. 116 Ex. A at 1; Pl.'s Supplemental Claim Interpretation Statement, Doc. 138 Ex. A at

1).

In construing this claim language, the magistrate judge "beg[a]n and . . . end[ed] with

the actual words of the claim," concluding that "[t]hese terms have a common and ordinary

meaning, and no ambiguity is evident."  (Doc. 152 at 8).  The magistrate judge determined

that "[t]hus, resort to the specifications, prosecution history and even the preferred

embodiment to add references to 'a long distance carrier' and a 'CDSC which answers the

call before calling a second party,' as proposed by Plaintiff, is not appropriate."  (Id. at 8).

However, the magistrate judge also found a flaw in Defendants' proposed construction,

noting that "it gives no effect to the word 'first' from the phrase in question" and "[i]t is clear

from the language of Claim 11, as confirmed by the specifications, that the method described has two steps – 'first routing' and then 'second routing.'"  (Id. at 9).

In its Objections, Plaintiff asserts that "[r]eplacing two words with synonyms (routing = delivering and center = facility) will not assist a Jury in determining what one of ordinary skill in the telephony industry would understand this claim language to mean."  (Doc. 156 at 6-7).  Plaintiff additionally argues that "refusal to consider the file history because no ambiguity is evident is clear legal error" and that "[o]ne cannot determine if ambiguity is present without reference to the file history."  (Id. at 7).  Plaintiff avers that the file history reflects that the Riskin Patent owner, "in order to overcome prior art, specifically limited the claim terms as it believed one of ordinary skill in the art would understand them, arguing the language had additional limitations."  (Id. at 7).

In its memorandum in support of its *Markman* motion, Plaintiff had stated that with respect to this claim language, "[t]he Court is asked to determine if this limitation requires (1) a call to be routed twice; and (2) the first routing is to a separate call-routing service center which can calculate distance, call a dealer and 'bridge' the call to the dealer."  (Doc. 62 at 6).  Plaintiff argued that this limitation plainly requires the routing of a call at least twice, first to a separate telephone service center – asserted by Plaintiff to be a "Customer Dealer Service Company" ("CDSC") – that is "capable of conducting the nearest-neighbor computation."  (Id. at 6-7).  According to Plaintiff, "[t]he second routing is from the CDSC to a selected dealer and bridging, or transferring the call."  (Id. at 7).

In the *Markman* Order, the magistrate judge agreed with Plaintiff's assertion that two calls occur in the Riskin system.  First, as noted above, after the definition of "first routing .

. .." is provided, the Order notes that Defendants' proposed construction had "give[n] no effect to the word 'first' from the phrase in question" and that "[i]t is clear . . . that the method described has two steps – 'first routing' and then 'second routing.'"  (Doc. 152 at 9).  In interpreting other language in Claim 11 – to which Plaintiff does not object – the magistrate judge construed "second routing of said call to said one second party" to mean "a second call placed by the telephone service center . . . ."  (Id. at 10).  Thus, Plaintiff's objection to the construction of "first routing of said call to a telephone service center" does not involve the failure to include Plaintiff's proposed language "which answers the call before calling a second party."

Instead, Plaintiff's concern with respect to the *Markman* Order's construction of this claim terminology is with the magistrate judge's definition of "telephone service center" as "telephone service facility" instead of "customer/dealer service company ('CDSC')" as Plaintiff had proposed.  The magistrate judge rejected Plaintiff's proposed construction, concluding that "resort to the specifications, prosecution history and even the preferred embodiment to add references to 'a long distance carrier' and a 'CDSC which answers the call before calling a second party'. . . is not appropriate."  (Id. at 8).  However, the Court disagrees with this conclusion to some extent.

Plaintiff's argument that "telephone service center" should be defined as "customer/dealer service company" – described by Plaintiff during oral argument as "a physical facility, located outside the national network"[3] –  is based on the file history and

_____

[3](See Tr. of 01/24/04 Oral Argument, Doc. 175 at 19).

language elsewhere in the Riskin Patent.  Taking the latter first, the Abstract of the Riskin Patent states in part:  "The system identifies the originating telephone number of the potential customer and a computer initially routes the call to a specific customer dealer service company (CDSC) office in the general vicinity of the potential customer.  The specially equipped CDSC HQ office includes a vertical-horizontal (V-H) file listing each dealer by product/service and equivalent of longitude/latitude."  (Abstract of Riskin Patent, Doc. 64 Ex. A, Reexamination Certificate at 1).  Additionally, the "Summary of the Invention" in the Riskin Patent refers to routing centers "chosen by the CDSC."  (Riskin Patent col. 4 l. 39).

The "Detailed Description of the Preferred Embodiment" section of the Riskin Patent and the accompanying diagrams also refer to CDSCs.  (See, e.g., Riskin Patent col. 7 ll. 46-49) ("In the diagram, the boxes labeled 20, 28, 30, 32, 34 and 40 are six private customer/dealer service companies (CDSC) Routing Centers (RC).").  A section of the Riskin Patent entitled "Description of Company Routing Centers" describes "two types of CDSC RCs."  (Riskin Patent col. 11 ll. 28-62).  CDSCs are also mentioned in the "Alternative Embodiment of the Invention" section.  (Riskin Patent cols. 27-28).  This section states in part:  "In the alternative embodiment, the LDC database processor would be supplied by the CDSC with a listing of the 800 telephone numbers which are owned by the CDSC customers and which are to be processed by the CDSC instead of the LDC database processor."  (Riskin Patent col. 27 ll. 37-41).  The "Glossary of Abbreviations" in the Riskin Patent lists "CDSC" as "Customer/Dealer Service Company – this is an organization that performs certain services described herein."  (Riskin Patent col. 28 ll. 59-60).

-12-

Plaintiff also relies on the Riskin Patent prosecution history, including part of the Amendment submitted on Mr. Riskin's behalf in response to a December 31, 1990 Office Action in Reexamination.  (Ex. B to Doc. 64, beginning at RR02298).  There, in summarizing the patent, Mr. Riskin stated that telephone calls are routed "to a designated one of several customer/dealer service companies routing centers (CDSC RC) . . . ."  (Id. at RR02310).  Mr. Riskin continues:

> The LDC data base computer sends the telephone number of the designated CDSC RC back to the LDC toll office. The LDC toll office routes the call to the LEC local central office which serves the private CDSC RC.  The CDSC RC acquires the caller's telephone number consisting of at least six digits (NPA-NNX) and the 800 number originally dialed by the caller, plus an optional extension to the dialed number.
> The system searches a table which when entered with the originally dialed number and optional extension as the argument, yields advertiser, product and advertisement as the function. Given the advertiser and product, . . . the system selects a file to be searched consisting of dealers who sell the product . . . . The file is part of the CDSC data base consisting of many advertisers, products and advertisements.  Each record in the selected dealer file contains geographic coordinates based on the Vertical-Horizontal (V-H) Coordinate System which were previously inserted when the data base was created or updated.

(Id. at RR02310-RR02311) (internal patent references omitted).

In their memorandum in response to Plaintiff's *Markman* motion, Defendants provide an "overview" regarding the Riskin Patent, stating in part:

> Riskin . . . disclosed systems and methods for routing 800 calls to the nearest dealer location by first routing the call to an independent "telephone service center" that could provide "enhanced" call routing services, or by establishing a data link from the independent telephone service center to the long distance carrier.  The Riskin specification labeled such telephone service companies capable of performing "Enhanced

Services" as "private customer/dealer service companies (CDSCs), which could also employ computer centers (labeled by Riskin as "routing centers"). The claims themselves, such as claim 11, broadly refer to a telephone service provider who could provide the "enhanced" call routing services of Riskin as "a telephone service center."

(Doc. 111 at 1-2) (record citations and footnote omitted). Defendants then explained that the Riskin preferred embodiment describes routing of a call from an LDC "to a private telephone service company that can provide the desired Enhanced Services (which Riskin calls the CDSC)," and "the CDSC then dials a call to the closest dealer and when the dealer answers, bridges the original caller to the dealer." (Id. at 2). Defendants also note that in an "Alternative Embodiment" described within Riskin, "the LDC does not route the call to a CDSC but instead sends data to the CDSC over a data link." (Id. at 3).

Defendants argue that "[t]he term 'telephone service center' has its ordinary meaning of a 'center' – defined as 'a facility providing a place for a particular activity or service' – that in this context provides telephone services." (Id. at 4) (record citation omitted). Defendants acknowledge that Riskin had used what he labeled "CDSCs" in the Preferred Embodiment, but they argue that while "'CDSC' is . . . certainly encompassed by the ordinary meaning of a 'telephone service center,' . . . the mere naming a CDSC and describing its particular make-up in the preferred embodiment cannot operate to restrict the otherwise broader meaning of a 'telephone service center.'" (Id.). "The mere labeling (i.e., 'CDSC') by Riskin in his specification of the independent telephone service provider that could provide enhanced call routing services," assert Defendants, "cannot operate to limit the Riskin patent to only those organizations actually named 'CDSC' or 'customer/dealer service center.'" (Id.

at 5).  Defendants aver that the reexamination file history does not in any way limit the meaning of "telephone service center" – a term which was not amended on reexamination. Because "telephone service center" would, say Defendants, clearly be understood by one skilled in the art "to refer to an organization capable of performing the call routing and processing services, capable of using a computer to perform calculations or store information, and, given the time frame and restrictions in place in 1987, capable of providing 'Enhanced Services,'"(Id.) (record citation omitted), Defendants argue that Plaintiff is attempting to impermissibly "ignor[e] common meanings and go[] directly to the specification and file history."  (Id.).

Although Defendants urge that "telephone service center" is "simply a center that provides a service involving telephones," (see Tr. of 01/21/04 Oral Argument, Doc. 175 at 58), the Riskin Patent clearly contemplates more than this.  As noted earlier, the Abstract of the Riskin Patent refers to a "specially equipped CDSC HQ office" which includes V-H listings.  Thus, the telephone service center must be "specially equipped" in this way so that it is capable of routing the call based on the locations of the central offices of the caller and the dealers.  Such a center is beyond "simply a center that provides a service involving telephones" as proposed by Defendants.  Indeed, Defendants note in their Markman memorandum that Riskin refers to "a telephone service center" in Claim 11 as "a telephone service provider who could provide the 'enhanced' call routing services of [the] Riskin" patent.  (Doc. 111 at 2).  Defendants also describe the "telephone service center" as "independent."  (Id.).  In sum, Defendants' description of "telephone service center" as "a center that provides a service involving telephones" is not accurate, and their proposed

construction – which does not further define the telephone service center beyond renaming it a "telephone service facility" – is not acceptable.

However, Plaintiff's proposed construction of "first routing of said call to a telephone service center" is not entirely satisfactory either.   Again, this proposed construction is: "routing a call from a long distance carrier to a customer/dealer service company ('CDSC'), which answers the call before calling a second party."  Although a "telephone service center" is more than "a center that provides a service involving telephones," as urged by Defendants, such a center need not be officially labeled a "customer/dealer service center" as averred by Plaintiff.  The "telephone service center" described in Riskin must be capable of providing enhanced services – i.e., making calculations – but its label is not crucial.  Thus, the Court construes "first routing of said call to a telephone service center" as:   "first routing a telephone call to a telephone service facility that is capable of routing a call based on the distance between the central office of the caller and the central offices of second parties."

Claim 11 of Riskin:  "determining the location of said one second party"

The magistrate judge interpreted this phrase to mean "ascertaining the place of a supplier of items who is located geographically nearest to the caller." (Doc. 152 at 9).  This interpretation is identical to Defendants' proposed construction.  (Joint Claim Construction Statement, Doc. 116 Ex. A at 1).  Plaintiff, on the other hand, had urged that "determining the location" should be construed to mean "identifying the V-H coordinates of a party's (i.e. caller, dealer, gift recipient) central office and assigning the location of the central office as that party's location."  (Joint Claim Construction Statement, Doc. 116 Ex. A at 1; Pl.'s

Supplemental Claim Interpretation Statement, Doc. 138 Ex. A at 1).

In its Objections, Plaintiff argues that in order to get the patent claims allowed, "the Riskin patent owner specifically argued that one of ordinary skill in the art would construe these claim terms to be narrow and would necessarily include the limitations Plaintiff proposes in its claim construction." (Doc. 156 at 8). Plaintiff urges that "[t]he Riskin owner may not now recapture what it has disclaimed during prosecution." (Id.).

In its memorandum in support of its *Markman* motion, Plaintiff notes that much of the language in paragraph (b) of Claim 11 – "determining the location of said one second party based on information associating each second party with a geographic location which is located the shortest geographic distance from the location of the first party based at least in part on the telephone number dialed by said first party" – had been added during re-examination in order to get the claims allowed. (Doc. 62 at 9-10). Originally, this language had read, "determining the location of a relatively nearby second party based upon the telephone number dialed by said first party." (Riskin Patent Reexamination Certificate, col. 2; see also "original" Riskin Patent col. 30 ll. 62-64). Plaintiff argues that "Riskin is and must necessarily be limited to a system which uses an algorithmic calculation to identify, out of a group of second parties (dealers), the dealer located the shortest geographic distance to the caller. The physical proximity of the dealer must not be merely coincidental. The Owner of the Riskin Patent argued that mere coincidental routing to the nearest dealer was something quite different than the invention." (Doc. 62 at 10).

Plaintiff further points to the file history for its argument regarding the "geographic location." Plaintiff asserts that "[t]he only disclosure Riskin makes to identify the location of

a party is through the use of an area code and exchange [the first six digits only], not the caller's entire number."  (Id.).  Thus, Plaintiff opines that the "geographic location of the second party . . . is not a street address or a specific longitudinal or latitudinal location, but is the location of the caller's or dealer's Central Office."  (Id. at 11).  Plaintiff emphasizes the arrangement of Central Offices on the V-H coordinate system and Riskin's acknowledgment of a "'built-in error' rate of up to three (3) miles, 'due to the assumption that callers and dealers are located exactly at the V-H coordinate.'"  (Id.) (quoting the Riskin Patent).  Plaintiff further notes that "if more than one dealer is tied to a single Central Office, Riskin's nearest neighbor algorithm calculates their distances as equidistant to the caller, and cannot provide the true closest dealer."  (Id.).

The Riskin Patent refers to V-H coordinates and the V-H system in several places. The Abstract includes the statements:  "The specially equipped CDSC HQ office includes a vertical-horizontal (V-H) file listing each dealer by product/service and equivalent of longitude/latitude.  A comparison is performed between the telephone number of the potential customer and the data in the V-H file to find 1-3 selected dealers nearby to the potential customer."  (Riskin Patent, Ex. A to Doc. 64, Abstract).  The "Background of the Invention" section of the Riskin Patent – more specifically, the "Description of Related Art" subheading of the Background – describes the V-H system as one "for determining the distance between a subscriber and a contacted party" that had been used for the purpose of "bill[ing] the subscriber based upon the geographical distance between the subscriber and the called party."  (Riskin Patent col. 1 ll. 52-61).  Riskin, however, also states in that section that "[t]he use of V-H systems for other than billing purposes is believed to be novel."  (Riskin

Patent col. 1 ll. 61-62).

The benefits of the V-H system are also touted in the "Summary of the Invention" section of the Riskin Patent, where the invention's improvements over previous methods are described:

> Given the first six digits (termed the NPA-NNX) of the caller's telephone number, the system can determine the caller's location by reference to a telephone company computerized document called the "V-H" file.   V-H stands for "Vertical-Horizontal."  It is a file which associates a vertical and horizontal coordinate pair to every Central Office code (COC) in the telephone system. . . .
>
> The V-H is a complex transformation of latitude and longitude which is used by long distance telephone companies to compute the distance between a caller and a called party and thereby to assess the charge for the call.  The invention uses the V-H coordinate system to refer a caller to a dealer.

(Riskin Patent col. 2 ll. 66-68 & col. 3 ll. 1-13).  The Summary continues:

> After the digital voice subsystem interacts with the caller to acquire product/service identification and NPA-NNX, the computer proceeds to search the product/services-dealers database based upon the V-H coordinates.  It calculates the distance between several potential dealers and the caller and chooses the closest one to the caller.

(Riskin Patent col. 3 ll. 59-65).

The  Detailed  Description  of  the  Preferred  Embodiment  also  discusses  the  V-H system:

> The geographic coordinates are based on the V-H (Vertical-Horizontal) system recorded on computer readable media by the Bell Communications Research Company (Bellcore).  The V-H system and its application to this system are described in detail later.  The V-H file from Bellcore provides a coordinate pair for every telephone company Central Office (CO).  The COs are designated by their NPA-NNX so that given NPA-NNX as the

> argument the V-H file will yield a V-H coordinate pair as the function.
>
> The caller's NPA-NNX is searched in the V-H file and the search yields the caller's V-H coordinate.  Then, using a "Nearest Neighbor" algorithm to be described later, the system chooses a dealer nearby or nearest to the caller.

(Riskin Patent col. 8 ll. 26-41).  In the "Method of Acquiring Caller's Number and Dialed Number" subsection of the "Detailed Description of the Preferred Embodiment," the Riskin Patent states:  "There are several methods possible for acquiring the two data items needed to perform the automatic routing function.  The first of these two items is the caller's telephone number, **either the complete 10 digit number or, optionally the first six digits** termed the NPA-NNX."  (Riskin Patent col. 9 ll. 11-15) (emphasis added).

The V-H System itself is explained in detail later in the patent under the heading "Application of the V-H Coordinate System to the Dealer Locator Program":

> The V-H (Vertical Horizontal) Coordinate System was originated by the Bell System in 1960 to determine rate mileage on toll messages.  It employs the Donald Elliptic Projection which enables distance between points identified by their V-H coordinates to be calculated accurately without consideration of the earth's curvature.  The CDSC system uses this coordinate system as delivered by the Bell Communications Research Company of Piscataway, N.J.
>
> . . . .
>
> The coordinate system provides the NPA-NNX (Central Office Code) and the associated V-H coordinates of every telephone central office in the USA and Canada and parts of Mexico.  Given the argument of COC, the system can search the V-H file and retrieve the coordinates of a caller or dealer and can compute the distance between them easily and accurately.  . . .
>
> **The assumption inherent in this procedure is that both the caller and the dealer are located at their respective telephone central offices which, of course, is not true.  It is approximately true** because telephones are linked to their

central offices by copper wire loops which can extend only about three miles without requiring amplification equipment. Therefore, the average caller or dealer is approximately 1.5 miles from the central office serving his telephone.
. . . .
This describes an approximation method using the V-H coordinate system for locating a desired number of dealers nearby to a caller. There are several errors to be acknowledged while reiterating that this is an approximation method not a rigorous, provable algorithm. . . . **The assumption that the caller and dealer are located at the central office serving their telephones also induces error.**

(Riskin Patent col. 23 ll. 37-45, 57-63; col. 24 ll. 5-13; col. 26 ll. 51-55, 67-68; col. 27 ll. 1-2) (emphasis added). The "Alternative Embodiment of the Invention" also relies on the V-H system. (Riskin Patent cols. 27 & 28).

It is significant that in the prosecution history, Riskin also made reference to the V-H system to overcome rejection of his claims. In December 1990, on reexamination the Examiner had rejected several claims, including Claim 11, as unpatentable over prior art. (Riskin Prosecution History, Ex. B to Doc. 64, at RR02281). In making that rejection, the Examiner stated that "[a]ll the basic features" of Riskin's system had been shown in the Asmuth prior art patents and that the prior art of Sheinbein taught the routing of calls to a company location (out of many possible company locations) nearest to the caller. (Id.). The Examiner thus found the Riskin system to be an obvious modification of prior art. (Id.).

In response, Riskin filed a declaration in February 1991 explaining how his invention was superior to systems that routed calls based on area code. (Id. at RR02286). Riskin argued in part that the closest dealer might not necessarily be in same area code but could be just across the area code border. (Id. at RR02289). Riskin also argued that "[n]one of

the references of record compare the area code and the local central telephone office code of the first party against a second party database." (Id. at RR02294).

Also in February 1991, Riskin filed an "Amendment" in response to the December 1990 Patent and Trademark Office Action. (Id. at RR02298). In the Amendment, Riskin noted that Claim 11, inter alia, had "been amended to indicate that the system determines the location of the one second party out of a group of second parties which is located the shortest geographic distance from the location of the first party." (Id. at RR02309) (emphasis in original). In describing the patent in the Amendment, Riskin stated:

> Each record in the selected dealer file contains geographic coordinates based on the Vertical-Horizontal (V-H) Coordinate System which were previously inserted when the data base was created or updated. Similarly, the caller's NPA-NNX is searched in the V-H file to yield the caller's V-H coordinates. Using a "nearest neighbor" algorithm, the system calculates in real time the geographic distance between the location of the caller and the location of one or more of the dealers. Thus, the system ascertains the geographic location of both the caller and the dealers. Based upon the calculations, the system selects the dealer which is located the shortest geographical distance from the location of the caller.
>
> A detailed explanation of the "nearest neighbor" algorithm is set forth in the patent beginning at column 23, line 34 and extending through column 27, line 2. The V-H coordinate system provides the NPA-NNX and the associated V-H coordinates of every telephone central office in the U.S.A., Canada and parts of Mexico. Given the argument of COC, the system can search the V-H file and retrieve the coordinates of a caller or dealer and can compute the distance between them easily and accurately. . . .
>
> Once the system determines the geographic distances between a selected number of dealers and the caller, the system selects the dealer which is located the shortest geographic distance from the location of the caller.

(Id. at RR02311-12) (patent references omitted) (emphasis in original).

In addressing the Examiner's prior rejection of, inter alia, Claim 11, as unpatentable over two Asmuth Patents "in view of the Sheinbein and Weber publication," Riskin asserted that the AT&T system to which those prior art references were directed functioned by routing calls based on assignments to the caller's area code – routing "based on the <u>broad</u> geographic position of the caller by using the area code of the caller." (<u>Id.</u> at RR02321) (emphasis in original). Riskin quoted from the Sheinbein publications: "With the new [AT&T] system, subject to tariff considerations, they [(the customers)] will have just one 800 number to advertise, with the call being routed to the closest open-reservation center." (<u>Id.</u>) (alterations in original).

Riskin then asserted that although this statement from Sheinbein seemed to suggest routing to the caller's closest reservation center, viewing the system as a whole it in fact did not teach routing to the closest reservation center but instead to the reservation center that would result in the least expensive rate. (<u>Id.</u>). Riskin also argued that the AT&T system did not determine the location of second parties but instead determined which second party had been assigned to the area code of the caller. (<u>Id.</u> at RR02322). Riskin emphasized that "<u>the AT&T system does not include any means whatsoever of determining the geographic position of the second parties</u> with sufficient accuracy to locate the one second party which is located the shortest geographic distance from the location of the first party." (<u>Id.</u>) (emphasis in original). Riskin also noted that "area codes used in the United States often encompass a significant geographic area" and that call routing based on area code would often not result in routing to the nearest dealer because a dealer outside the area code could actually be closer to the caller than were dealers within the area code. (<u>Id.</u> at RR02323).

Continuing his arguments regarding the patentability of Claim 11, Riskin stated:

> As mentioned previously, the present invention uses a nearest neighbor algorithm in combination with the V-H Coordinate System to calculate in real time the geographic distance between the location of the caller and the location of one or more of the dealers.  Based upon the calculation, the system selects the dealer which is located the <u>shortest geographical distance</u> from the location of the caller.  This concept is clearly not taught by the AT&T system which merely utilizes a straight table look-up.
>
> In summary, the AT&T system does not include any means whatsoever for <u>determining the geographic position of the second parties</u> with sufficient accuracy to locate the one second party which is located the <u>shortest geographic distance</u> from the location of the first party.  Since the AT&T system is based on area code, it cannot accommodate a plurality of second parties for the purpose of determining one second party which is located the shortest geographic distance from a location of the first party.  In addition, one of ordinary skill in the art would not modify the AT&T system to further include a table look-up based on area code and another portion of the caller's number since the system would be too cumbersome and not economically feasible.  Lastly, the AT&T system does not calculate in real time the geographic distance between the location of the caller and the location of one or more of the dealers to select the dealer which is located the shortest geographical distance from the location of the caller.

(<u>Id.</u> at RR02326-27) (emphasis in original).  Riskin made further arguments to distinguish Claim 11 from the prior art of Connell and Lee, which related to routing of 911 calls.  (<u>Id.</u> at RR02340).  Riskin asserted that the 911 calls were routed based on designation of service centers to particular communities rather than shortest distance (<u>Id.</u>), and Riskin also argued that the Connell and Lee systems "will connect the caller to the <u>designated</u> emergency service center in the jurisdiction of the caller even if there are other emergency service systems located in other jurisdictions which are geographically closer to the caller." (<u>Id.</u> at

RR02341) (emphasis in original).

Both the Riskin Patent itself and its prosecution history support a definition of "location" as the location of the central offices of the caller and dealers rather than the actual locations of the caller and dealers.  Throughout the patent, the V-H coordinates are emphasized, the assumption that the callers and dealers are located at the central office is disclosed, and the attendant error as to the accuracy of "location" is conceded.  Although the patent uses the word "location," as noted during oral argument in this case, "location" can and does have many "levels of granularity" – for example, a planet, a continent, a country, a state, an area code, a city, a street, a building, a room, a desk.  (See, e.g., Tr. of 01/21/04 Oral Argument, Doc. 175 at 60-65).  It is clear that when Riskin used the word "location" with respect to the caller and dealers, he was referring to the location of the caller or dealers' central office.  Just as Riskin argued during prosecution that area code systems would not necessarily yield the true closest dealer because there could be a closer dealer just outside the area code, the central office system has the same problem.

The decision of the Federal Circuit Court of Appeals in C.R. Bard, Inc. v. United States Surgical Corp., 388 F.3d 858 (Fed. Cir. 2004), is instructive.  In that case, the court addressed claim construction in the context of a patent involving a surgical mesh plug used in hernia repair.  In the claim at issue in that case, the hernia plug was described as being "conformable" and "pliable" but not as requiring pleats.  Nevertheless, the district court construed the claim as requiring that the plug be pleated, and the Federal Circuit affirmed that construction based on both the specification and the prosecution history of the patent.

In rejecting the appellant's argument that the plain meanings of "conformable" and

-25-

"pliable" did not necessarily require pleats, the C.R. Bard court noted that "the ordinary and customary meaning of a term does not govern if the intrinsic record contains clear lexicography or disavowal of claim scope." 388 F.3d at 863. The court then examined the specification of the patent, observing that both the Summary of the Invention and the Abstract described the plug as having pleats. 388 F.3d at 864. Discussing the role of the specification in claim construction, the C.R. Bard court explained that the location of a statement within the patent, although not determinative, "can signal the likelihood that the statement will support a limiting definition of a claim term." 388 F.3d at 864. "Statements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term." Id. And, such statements describing "the invention as a whole are more likely to be found in certain sections of the specification, such as the Summary of the Invention." Id. The C.R. Bard court determined that the hernia plug at issue was "defined globally as requiring a pleated surface" and thus limited the claim at issue. Id. The court noted that the patent defined the claimed plug as having pleats both in "[s]tatements of general applicability" and in "preferred embodiments." 388 F.3d at 866. See also Microsoft Corp. v. Multi-Tech Sys., Inc., 357 F.3d 1340, 1347-49 (Fed. Cir.) (noting that "the claims must be interpreted in light of the specification" and reading limitation of "telephone line" into claim where that term appeared throughout the specification, including in the "Summary of the Invention," but did not appear in the claim itself), cert. denied, 125 S. Ct. 61 (2004).

The C.R. Bard court then turned to the prosecution history of the patent, including arguments made by Bard on reexamination. In attempting to get the subject claim allowed

on reexamination, Bard had distinguished its hernia plug from another hernia plug on the basis of pleats, stating specifically that "the surface of the inventive plug is pleated."  388 F.3d at 868.  The court thus found that "the prosecution history provides an independent ground for construing [the claim] as requiring a plug with a pleated surface."  388 F.3d at 869.  See also Microsoft Corp., 357 F.3d at 1349 (looking to prosecution history to confirm that inventor had "viewed its inventions as being limited to communications over a telephone line" even though telephone line limitation did not appear in claim itself, and noting that the court "cannot construe the claims to cover subject matter broader than that which the patentee itself regarded as comprising its inventions and represented to the PTO").

Here, as in C.R. Bard, both the specification and the prosecution history support a limiting reading of this language from Claim 11.  Throughout the specification of the Riskin Patent, reference is made to the V-H system and the fact that the location of the caller and dealers is assumed to be the location of the central office for the exchange.  There is no way in the Riskin Patent to more precisely determine a "location" than the location of those central offices, which is determined using the first six digits of the telephone number of the caller or dealers.  Additionally, in the prosecution history Riskin described his invention as using the V-H system, and just as he argued that "closest" in Sheinbein did not truly mean geographically closest, so, too, does reference to "location" in the Riskin Patent not refer necessarily to the truly geographically nearest dealer as defined in the *Markman* Order.  Thus, the Court finds that Plaintiff's proposed construction is well-founded, and the Court construes "determining the location of one second party" as "identifying the V-H coordinates of a party's central office and assigning the location of the central office as that party's

location."

    Claim 11 of Riskin:  "second routing of said call to said one second party"

    The magistrate judge interpreted this phrase to mean "a second call placed by the

telephone service center to the supplier located geographically nearest to the caller so as

to connect the caller with the supplier." (Doc. 152 at 10).  The Plaintiff had proposed that this

phrase be construed to mean:  "Second routing occurs when the computer (or alternatively

a live operator) places a second call to the dealer (after a first call from the caller) so as to

cross-connect the caller with the dealer."  (Joint Claim Construction Statement, Doc. 116 Ex.

A at 2; Pl.'s Supplemental Claim Interpretation Statement, Doc. 138 Ex. A at 1).  Defendants,

on the other hand, had proposed the following construction:  "delivering a telephone call to

the supplier who is located geographically nearest to the caller according to an assigned

path or scheduled sequence."  (Joint Claim Construction Statement, Doc. 116 Ex. A at 2).

Neither side has objected to the *Markman* Order's construction of this claim term, and thus

the Court will not address it.

    Claim 34 of Riskin:  "second party telephone number determining means for
    determining the telephone number of said second party"

    Claim 34 is a means-plus-function claim.  See 35 U.S.C. § 112 ¶ 6.  The magistrate

judge interpreted this language as:  "the function is obtaining the phone number of the

intended recipient of an item not co-located with the caller; the structure is a computer able

to solicit, accept and process numeric input from a caller orally or via telephone keypad."

(Doc. 152 at 12) (emphasis removed).  In its Objections (Doc. 156), Plaintiff did not object

to the magistrate judge's interpretation of any terms in Claim 34 of the Riskin Patent. However, in what is labeled as Plaintiff's Response to Defendant's Objections (Doc. 160), Plaintiff purports to, for the first time, raise objections to the magistrate judge's construction of this language from Claim 34.  Although it is not proper for Plaintiff to raise objections in the guise of its response, and Defendants did not have an opportunity to file a response to this belated objection, the Court finds no error in the magistrate judge's interpretation of this language.

Plaintiff had proposed that the function be defined as "receiving a second party's telephone number for gift routing."  (Joint Claim Construction Statement, Doc. 116 Ex. A at 2; Pl.'s Supplemental Claim Interpretation Statement, Doc. 138 Ex. A at 1).  Defendant had proposed that the function be defined as "ascertaining the telephone number of the party to whom an item is to be delivered by the nearby supplier."  (Joint Claim Construction Statement, Doc. 116 Ex. A at 2).

The *Markman* Order states in part with respect to this claim language:

> The parties differ over whether claim 34 is limited to "gift" routing and, to some degree, the type of device able to receive the phone number.
> . . . .
> Defendants note that the word "gift" is not found in the claim and is too narrow an interpretation of the word "item." Nothing in Claim 34 itself suggest limiting non caller recipients to those getting gifts.  Using the rules of construction set forth above, the Court agrees that Claim 34 is not limited to "gift routing" but speaks to item routing to a second party, that is, a party other than the caller.

(Doc. 152 at 13).  In its "Response" (Doc. 160), Plaintiff argues that the magistrate judge's construction of this claim language "ignores . . . that in order to overcome a rejection of

Claim 34 during reexamination Riskin specifically asked the examiner to exclude Claim 34 from any further substantive discussion by identifying it as *limited solely to "gift routing."* (Doc. 160 at 7-8) (emphasis in original).  Plaintiff now asserts that the magistrate judge "committed clear legal error in refusing to consider th[e] clear and unambiguous disavowal of the broad claim construction" and that "Defendants are attempting to recapture a limitation that Riskin urged upon the examiner, which is improper."  (Id. at 8).

In asserting that Riskin disclaimed any broader construction of Claim 34 than just "gift routing," Plaintiff cites part of the Riskin file history.  Specifically, Plaintiff cites part of the "Amendment" that Riskin submitted to the Patent Examiner on reexamination.  In that "Amendment," Riskin stated as follows with respect to Claim 34:

> Turning now to claims 34 and 35, claim 34 recites <u>inter alia</u>, a system for placing an order for an item based upon a telephone call from a first party who dials a telephone number, including digits characteristic of the item <u>to be delivered to a second party from a nearby third party</u> out of a group of third parties who can supply the given items, the telephone system comprises second party telephone number determining means for determining the telephone number of the second party; <u>location determining means for determining the location of the nearby third party based at least in part on the telephone number dialed by the first party</u>; and routing means connected to the location determining means <u>for routing the telephone call from the first party to the third party nearby the second party who can supply the item</u>.  Claim 35 recites that the item comprises a gift for the second party.
>
> Claims 34 through 36 are directed to gift routing.  Gift routing relates to the dealer selection performed by the invention in the case of a gift, e.g., flowers or candy, to be sent to the recipient by the caller.  A special 800 number is published, such as 1-800-CANDIES.   When the computer answers the telephone, it asks the caller the telephone number of the recipient (in contrast to the telephone number of the caller) of the gift.  The system locates a retailer represented in the

database which is located nearby the recipient and routes the call to him as a function of the NPA-NNX of the recipient.  The caller is thus connected by telephone to the retailer nearby <u>to the recipient</u>.

Asmuth '094, Asmuth '096 and Sheinbein et al. taken together or alone clearly do not disclose, suggest or teach the concept of determining the telephone number of a second party and determining the location of a nearby third party to thereby <u>route the telephone call from the first party to the third party nearby the second party who can supply the item or gift</u> (Riskin Declaration ¶ 15).  For all of the above reasons, applicant submits that the rejection of claims 34 and 35 is improper and requests reconsideration and allowance.

(Riskin Prosecution History, Ex. B to Doc. 64, at RR02328-RR02329) (emphasis in original).

In their memorandum in opposition to Plaintiff's *Markman* motion, Defendants argue that "Riskin's statement [in the reexamination history] is neither a disclaimer of all other routing except for 'gifts,' nor can it operate as a limitation.  At most, it simply provides context, or an example of using the claimed system." (Doc. 111 at 8).  Defendants assert that "item" should not be limited to "gift."  (<u>Id.</u>).

During oral argument, the magistrate judge inquired of Plaintiff's counsel regarding "gift routing":

The Court:  You want to address gift and what that has to do with Claim 34?

[Plaintiff's counsel]:   Well, I don't believe that the differentiation between item and gift has anything to do with anything.  Gift routing is the process, it's a broad general term.  But it was used by Riskin to move out of claim 34, from the general proposition of identifying this caller I.D. based upon the telephone number.  Instead, there has to be input, someone has to input a third party's telephone number.  Whether it's an item or gift doesn't make any difference, but there has to be a manifestation, a physical manifestation, an input of the six digits in order to proceed with the same procedure we've got here.  The idea of gift versus item I don't think makes –

> The Court:  What do I need to interpret in 34?
>
> [Plaintiff's counsel]:   The same general language, determining the location.
>
> The Court:  Then we're back to granularity.
>
> [Plaintiff's counsel]:  Yes, sir.
>
> . . . .
>
> The Court:  People kept talking about gift.  I didn't see that had any significance.
>
> [Plaintiff's counsel]:  I don't believe it does.  It's just the input of the third party.  But also, bear in mind claim 34 is a different animal in that it's a means plus function, so we incorporate specifications, so we can't divorce ourselves from that as well.
>
> The Court:  I understand that.  Again, just in terms of the everyday world, not speaking – lots of people order gifts.  Lots of people order things to be delivered that are not gifts.
>
> [Plaintiff's counsel]:  I don't think it makes any difference. That's just the purpose of me bringing it up is that's how Riskin described it.   To segregate it from the, and any type identification versus a dealer input or a user input.

(Tr. of 01/21/04 Oral Argument, Doc. 175 at 88-90).

The argument that Plaintiff now makes regarding "gift routing" is rejected.  The description of Claim 34 as being useful for sending gifts does not limit that claim to the sending of a gift as opposed to the sending of an "item" – the word used in that claim. Cf. Roberts v. Ryer, 91 U.S. 150, 157 (1875) ("It is no new invention to use an old machine for a new purpose.  The inventor of a machine is entitled to the benefit of all the uses to which it can be put, no matter whether he had conceived the idea of the use or not."); Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 809 (Fed. Cir. 2002) ("[A] patent grants the right to exclude others from making, selling, offering to sale, or importing the claimed apparatus or composition for any use of that apparatus or composition, whether or not the patentee envisioned such use.").

Moreover, Claim 35 of the Riskin Patent is for "[t]he system of claim 34 wherein said item comprises a gift for said second party."   (Riskin col. 33 ll. 13-14; <u>see also</u> Reexamination Certificate col. 1 ll. 22-24 (determining Claim 35 to be patentable as a dependent claim on an amended claim)).  Claim 35 would be meaningless if Claim 34 were also limited to gifts.  Thus, the Court discerns no error in the magistrate judge's construction of the disputed language in Claim 34.  The *Markman* Order's construction of this language stands:  "the function is obtaining the phone number of the intended recipient of an item not co-located with the caller; the structure is a computer able to solicit, accept and process numeric input from a caller orally or via telephone keypad."  (<u>See</u> Doc. 152 at 12).

<u>C.  The Neville Patents</u>

The only claim term of the Neville Patents (the '111 and '689 Patents) that is construed in the *Markman* Order is "direct routing" – a term which appears throughout the Neville Patents.  The magistrate judge interpreted "direct routing" in the Neville Patents "generally to embrace **achieving a connection between the caller and the intended supplier, without any input from the caller, without any redialing by the system, and without any pause in the process that would be perceived by the caller as anything other than a direct connection**."  (Doc. 152 at 19) (emphasis in original).

Defendants had proposed that "direct routing" be interpreted to mean "delivering a telephone call according to an assigned path or scheduled sequence, without intervention by a human (whether a live operator or the caller after having made the call) or by a computer (to dial or initiate a second call or to perform online calculations to compute and

determine the location to which the call is to be routed)."  (Joint Claim Construction

Statement, Doc. 116 Ex. A at 6).  Plaintiff had taken the position that "direct routing" should

be construed to mean "routing a telephone call to another party without a human or computer

re-dialing and placing the call, in contradistinction to the Riskin approach, in which the

computer (or an operator) answers the call and makes a second call to the dealer."  (Joint

Claim Construction Statement, Doc. 116 Ex. A at 6; Pl.'s Supplemental Claim Construction

Statement, Doc. 138 Ex. A at 2).  As noted in the *Markman* Order:

> [T]he essential disagreement [between the parties is] the extent
> to which the term "direct routing" limits what happens after a call
> is placed.  Plaintiff argues that the invention covers any routing
> between the caller and the supplier, so long as there is no re-
> dialing.   Defendants argue that the invention should be
> construed to eliminate any real time activity other than using a
> previously created, static database to look up the supplier
> already associated with the location of the caller and completing
> the call.

(Doc. 152 at 19).

Plaintiff objects to the magistrate judge's construction of "direct routing" to the extent

that it includes the phrase "without any input from the caller."  Plaintiff contends that "[t]his

phrase, if adopted by this Court, will only introduce ambiguity into a phrase with a meaning

well-defined in the specification and adopted by the examiner, and which is entitled to be

construed as it is defined in the specification." (Doc. 156 at 9).  Plaintiff urges that the patent

itself emphasizes that "direct routing" "does not *require* human intervention or a computer

redial to accomplish the goal of automatically connecting the caller . . . ."  (Id. at 12)

(emphasis in original).  Plaintiff argues that the magistrate judge improperly added a

limitation – "without any input from the caller" – which is not permissible in claim construction.

(Id. at 14).  According to Plaintiff, "this is a limitation capable of being misconstrued so as to negate the value of the invention altogether."  (Id.).

Plaintiff maintains that "direct routing" and other terms in the Neville Patents do not require interpretation because their meanings are plain.  (Doc. 108 at 3).  In Plaintiff's view, "all of the direct routing examples provided in the specification show a caller being connected to a destination with algorithmic steps during the call and without redialing or live operator intervention."  (Id. at 3-4).

Plaintiff's argument is that while "direct routing" does not **require** additional input from the caller, additional input from the caller is still **permissible** in the "direct routing" system of the Neville Patents.  Plaintiff contends that, for example, Voice Recognition Units (VRUs) which might prompt a caller to press an additional key to make a selection from a menu of options could still be used in a "direct routing" system even with input from the caller so long as there is no human operator involvement and no computer redial of the call.  Plaintiff asserts that adding the limitation "without any input from the caller" as the magistrate judge did would allow a competitor to use the technology of the Neville's "direct routing" with impunity – that is, without infringing – merely by interposing a VRU in the middle of the process while otherwise employing the same routing system.

Defendants, citing to the Neville Patents themselves, argue that "direct routing" precludes any "human intervention," including input by the caller.  (See Defendants' Brief in Support of Their Proposed Claim Constructions, Doc. 109).  Specifically, Defendants cite part of the "Summary of the Invention" which states:  "A corollary object of the present invention is to accomplish the above without need for intervention by a computer or human

being."  (Patent No. RE 36,111, Ex. A to Doc. 68, col. 3 ll. 21-23).  Defendants also cite part

of the "Background of the Invention" section of the Patent, which states:

> Many previous inventions have addressed the issue of call
> routing, but each of these involve either human intervention after
> the call is placed (either by the caller or by an operator at a
> remote location) or a computer-initiated redial of that call.
> Systems that require input by either an operator, the caller after
> the call is placed or a computer before the call is dispatched to
> the final destination are termed interactive systems.

(Patent No. RE 36,111, Ex. A to Doc. 68, col. 1 ll. 34-41).   Another portion of the

"Background of the Invention" section of the Patent upon which Defendants rely provides:

> If human interaction could be eliminated, fewer errors in
> call routing would occur, and the amount of time required to
> dispatch a call would be greatly reduced.
> The foregoing patent [Riskin] also requires that the caller
> dial from a "touch-tone" telephone in order to identify the caller's
> number and redial the computer.  Many areas of the United
> States and other countries use rotary telephones.  With the
> foregoing patent, callers who only have access to rotary
> telephone service are required to interact with the operator.
> With other systems, those calling from rotary telephone services
> are unable to be connected to the destination.
> [The McNaughton patent] describes another interactive
> system, whereby the caller is prompted to dial additional
> numbers after the initial call is made.  The foregoing system
> does not provide direct and immediate connection to the
> provider in which the call has originated.

(Patent No. RE 36,111, Ex. A to Doc. 68, col. 2 ll. 16-32).  Defendants further note that the

Neville Patents provide a definition of "Interactive System":  "A non-direct telephone routing

system that requires human input after a call has been made, and before the call is

dispatched to the final destination."  (Patent No. RE 36,111, Ex. A to Doc. 68, col. 4 ll. 24-

26).  Defendants state that "800 Adept admits in this litigation that 'direct routing' cannot

encompass a live operator, but argues that caller input after the call is made is somehow captured by the term 'direct routing.'  This is wrong and directly contradicted by 800 Adept's clear and unambiguous statements in the specification distinguishing over the prior art."  (Doc. 109 at 4).

Part of the "Background of the Invention" section of the '111 Patent provides:

> There is a well-recognized need for a system that can directly route a customer's call to a provider of the advertiser's product in whose territorial limits the call originates, and do so by providing the caller with a direct connection to the provider, without human intervention after dialing, and without need of a computer to redial and place the call.

(Patent No. RE 36,111, Ex. A to Doc. 68, col. 1 ll. 28-33).   Another segment of the "Background of the Invention" section of the '111 Patent provides:

> The present invention, unlike the Riskin patent, does not require a second routing means but rather direct-connects the caller to the appropriate location after the caller has dialed a single regionally or nationally advertised telephone number (a "1-800" number, for example), with no further calls being initiated, whether by a human operator or by a computer.

(Patent No. RE 36,111, Ex. A to Doc. 68, col. 3 ll. 1-7).   The "Summary of the Invention" section of the '111 Patent provides in part:

> The primary object of the present invention is to provide a reliable and cost-effective manner of directly connecting callers interested in an advertiser's product with providers of the advertiser's product in the area that the call originates during the [t]ime frame in which the caller has the highest degree of interest in the advertiser's product.
> A corollary object of the present invention is to accomplish the above without need for intervention by a computer or human being.

(Patent No. RE 36,111, Ex. A to Doc. 68, col. 3 ll. 15-23).

In the prosecution history of the Neville Patent (Exs. C, D, & E to Doc. 68), reference is made to "direct routing."  Neville argued, in attempting to distinguish his patent from the Finucane prior art patent, that the Finucane patent required calculations with the caller on the line, whereas in his invention all calculations were done in advance; Neville stated that this difference was why his "system is referred to throughout the specification and in the claims as a 'direct routing system' as contrasted to the Finucane, et al. patent, which is referred to as a 'special service call processing' system."  (Ex. C to Doc. 68, at C-6 to C-7).  The Examiner, however, referred to the Finucane system as disclosing "a system and method for direct routing."  (See, e.g., id. at C-9).  The Examiner stated:  "Finucane **does** disclose a 'direct routing' system, defined by the applicant as a system in which human intervention after the call is placed or a computer-initiated redial of the call is avoided."  (Id. at C-13) (emphasis in original).  In distinguishing his invention from Riskin's, Neville noted that in the Riskin system two calls are made and the 800-number owner pays for two calls, whereas Neville's system "allows the long distance carrier to automatically match the telephone number of the first party to the telephone number of the second party contained in a database, nothing else."  (Id. at C-40).

The Court agrees with Plaintiff's position regarding the definition of "direct routing." Although "direct routing" does not **require** caller input, there is no basis for reading a prohibition on caller input altogether into the term, as proposed by Defendants.  Thus, the Court adopts the following construction of "direct routing," which is similar to Plaintiff's proposed construction:  "routing a telephone call to another party without a human or computer re-dialing or otherwise placing a second call."

<u>Defendants' concerns regarding language following "direct routing" construction</u>

Although Defendants have not objected to the *Markman* Order's construction of "direct routing," Defendants seek clarification of the import of the five sentences immediately following the Order's express construction of "direct routing."[4]  Defendants state in their Objections that "[i]t is not clear whether these five sentences are actually part of the *Markman* Order's construction of 'direct routing.'" (Doc. 155 at 6).

However, in light of the Court's reconsideration of the claim construction issues (including, of course, the construction of "direct routing" set forth in the previous section), the magistrate judge's order is not being endorsed or adopted by the Court in full.  Thus, it is not necessary to address the impact or meaning of these five sentences.

————————————————

[4]These five sentences provide:

> The invention requires there be a database, made available to the long distance switching system, that quickly supplies the POTS number assigned to the caller.  The claim language and specifications do not limit that database to a static look-up table. Modern computer based databases may incorporate any number of features that improve processing efficiency or analytical flexibility, and nothing in the claim language excludes the possibility of such features.
> Defendants point to language in the Abstract and the tortured prosecution history suggesting that the invention contemplates "nothing else" than looking up a pre-assigned supplier number for every possible customer.  The specification provides that at least some of the connection determination process is pre-computed, but it does not foreclose construction of a database which can itself apply designated criteria.

(Doc. 152 at 19).

<u>"Direct routing" in the preamble of two claims in the Neville Patents</u>

As noted earlier, the term "direct routing" appears throughout the Neville Patents.

Where it appears in the body of a claim, "direct routing" undisputedly acts as a limitation of

that claim.  However, the parties disagree on whether "direct routing" limits those claims in

which it appears only in the preamble rather than the body – Claim 41 of the '111 Patent and

Claim 1 of the '689 Patent.  These claims pertain to construction of a database.  Claim 41

of the '111 Patent reads:

> 41.  A method of constructing a database wherein said database is used by a telephone service provider for **direct routing** a telephone call from a first party who has an originating telephone number at a physical location and who dials one of an 800-type, 900-type or other special access code telephone number assigned to a second party, who has determined specific locations to receive calls originating from within pre-determined geographic areas, thereby allowing the first party to reach one of a plurality of locations of the second party based on geographic location from which the telephone call originate from within one of a plurality of geographic areas, said method comprising the steps of:
>
> (a)   assigning individual latitude and longitude coordinates to the physical location of all potential first parties;
>
> (b)   defining the boundaries of one or more geographic areas which can be of any size and shape according to predetermined criteria each point along said boundaries being defined by latitude and longitude coordinates; and
>
> (c)   assigning to the physical location of said potential first parties a telephone number of a service location of a second party that will receive calls originating from within the boundary of a geographic territory in which the latitude and longitude coordinates of the physical location of each of said potential first parties lies.

('111 Patent, Ex. A to Doc. 68, col. 16 ll. 7-34) (emphasis added).  Claim 1 of the '689 Patent

reads:

> 1.  In a telephone system, a method of constructing a database wherein said database is used by a telephone service provider for **direct routing** a telephone call from a first party who dials one of an 800-type, 900-type or other special access code telephone number assigned to a second party, who has determined specific locations to receive calls originating from within pre-determined geographic areas, thereby allowing the first party to reach one of a plurality of locations of the second party based on geographic location of the first party from within one of a plurality of geographic areas, said method comprising the steps of:
>
> > a.   assigning individual latitude and longitude coordinates to each telephone number of all potential first parties;
> >
> > b.   defining the boundaries of one or more geographic areas which can be of any size and shape according to pre-determined criteria;
> >
> > c.   assigning to the telephone number of each potential first party a telephone number of a specific location of the second party that will receive calls originating from within a geographic area of each first party;
> >
> > d.   determining in which geographic area a potential call might originate for each potential first party in the area encompassed by all geographic areas; and
> >
> > e.   assigning the specific location of the second party to all potential first parties within the boundaries of each geographic area.

('689 Patent, Ex. B to Doc. 68, col. 12 ll. 64-68, col. 13 ll. 1-23) (emphasis added).

In Poly-America, L.P. v. GSE Lining Technology, Inc., 383 F.3d 1303, 1309-10 (Fed. Cir. 2004), the Federal Circuit explained:

> Whether to treat a preamble as a limitation is a determination resolved only on review of the entire[] . . . patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim.  No litmus test defines when a preamble limits claim scope.  On the one hand, a

> preamble is a claim limitation if it recites essential structure or
> steps, or if it is necessary to give life, meaning, and vitality to the
> claim.  On the other hand, a preamble is not limiting where a
> patentee defines a structurally complete invention in the claim
> body and uses the preamble only to state a purpose or intended
> use for the invention.  Further, when reciting additional structure
> or steps underscored as important by the specification, the
> preamble may operate as a claim limitation.

(citations and internal quotations omitted) (alterations in original).  "Thus, if the preamble

helps to determine the scope of the patent claim, then it is construed as part of the claimed

invention."  NTP, Inc. v. Research in Motion, Ltd., 392 F.3d 1336, 1358 (Fed. Cir. 2004).

And, "'[w]hen limitations in the body of the claim rely upon and derive antecedent basis from

the preamble, then the preamble may act as a necessary component of the claimed

invention.'"  Id. at 1359 (quoting Eaton Corp. v. Rockwell Int'l Corp., 323 F.3d 1332, 1339

(Fed. Cir. 2003)).

    "[C]lear reliance on the preamble during prosecution to distinguish the claimed

invention from the prior art transforms the preamble into a claim limitation because such

reliance indicates use of the preamble to define, in part, the claimed invention.  Without such

reliance, however, a preamble generally is not limiting when the claim body describes a

structurally complete invention such that deletion of the preamble phrase does not affect the

structure or steps of the claimed invention."  Catalina Mktg. Int'l, Inc. v. Coolsavings.com,

Inc., 289 F.3d 801, 808-09 (Fed. Cir. 2002) (citations omitted); accord Applied Materials, Inc.

v. Advanced Semiconductor Materials Am., Inc., 98 F.3d 1563, 1572-73 (Fed. Cir. 1996)

("Whether a preamble stating the purpose and context of the invention constitutes a limitation

of the claimed process is determined on the facts of each case in light of the overall form of

the claim, and the invention as described in the specification and illuminated in the prosecution history."). Compare NTP, 392 F.3d at 1359 (construing language in preamble as claim limitation where preamble provided antecedent basis and context for claims), Poly-Am., 383 F.3d at 1310 (concluding that preamble term "blown-film" was a claim limitation in patent pertaining to landfill liner technology, agreeing with district court's assessment that the term "discloses a fundamental characteristic of the claimed invention" rather then merely stating "a purpose or an intended use of the invention"), and Invitrogen Corp. v. Biocrest Mfg., L.P., 327 F.3d 1364, 1370 (Fed. Cir. 2003) (agreeing with district court's determination that preamble served as claim limitation where prosecution history reflected that patent applicants had relied on preamble during prosecution), with Intirtool, Ltd. v. Texar Corp., 369 F.3d 1289 (Fed. Cir. 2004) (reversing district court's determination that preamble served as claim limitation, noting that the preamble did not recite additional structure or steps and that there was no reliance in the prosecution history on the preamble), Storage Tech. Corp. v. Cisco Sys., Inc., 329 F.3d 823, 831 (Fed. Cir. 2003) (reversing district court's conclusion that preamble limited claim), and Catalina Mktg., 289 F.3d at 810 (reversing district court's decision that preamble language served as claim limitation; preamble language was not relied upon to distinguish claim from prior art, and deletion of the phrase from the preamble did not affect the structure or operation).

Defendants state that they are unsure as to whether the *Markman* Order renders "direct routing" a limitation of Claim 41 of the '111 Patent and Claim 1 of the '689 Patent. They assert that "[e]verything in the *Markman* Order suggests that the [magistrate judge] agreed" with Defendants that "direct routing" should be read as a limitation on these two

claims, but "[b]ecause the *Markman* Order's ruling on this matter is implied rather than direct, however, Defendants request that the Court expressly confirm this ruling in order to prevent potential confusion in the future." (Defs.' Objections to *Markman* Order, Doc. 155 at 9).

In their original argument to the magistrate judge, Defendants asserted that "direct routing" should be read as a limitation on these claims even though it appears only in their preambles because in the file history Plaintiff used the preamble to distinguish prior art. (See Doc. 109 at 6). Defendants relied on the following portion of the prosecution history:

Finucane, et al. requires that a computer perform "point of origin" to "point of termination" calculations while a caller is on line . . . . On the other hand, applicant's Direct Routing Telephone System performs all such calculations prior to the call even being made and, in fact, prior to delivery of the data base to the Long Distance Carrier (LDC). Once the LDC accesses the database, the ANI is read and the corresponding termination number is immediately retrieved. . . . The second major difference is why Applicant's system is referred to throughout the specification and in the claims as a "direct routing" system. . . .

(Id. at 6-7) (quoting Ex. D to Doc. 112 at 123-24[5]) (emphasis removed).

In their Objections to the *Markman* Order Defendants mention that reliance on a preamble during prosecution can render the preamble a claim limitation, but their emphasis in the Objections is not on that rationale for limiting the claims but instead on their argument that the claims are "incomprehensible" without their preambles. (Doc. 155 at 10). Defendants assert that the preambles "stat[e] what the invention is, who can use it, how it is used, when it would be used, and why it would be used." (Id.). Defendants also assert that "[e]ach limitation in Claim 41 of the '111 patent and Claim 1 of the '689 patent relies upon and derives antecedent basis from its claim preamble." (Id. at 11).

Plaintiffs, on the other hand, argue that the bodies of the subject claims are

---

[5]This record item also appears as Ex. C to Doc. 68 at C-6 to C-7.

structurally complete without the preamble and that therefore "direct routing" is not a limitation of these two claims.  (See Doc. 160 at 16-17).  Plaintiffs assert that at most, the preambles of these claims state the intended use or purpose of the invention described in the claims, which is not enough to render the preambles a claim limitation.

Plaintiffs have the better argument on this point. "Direct routing," which appears in Claim 41 of the '111 Patent and Claim 1 of the '689 Patent only in the preamble and not the body, does not serve as a limitation on these two claims.  These claims are structurally complete in their bodies without reference to their preambles.  See, e.g., Catalina, 289 F.3d at 808 ("[A] preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'") (quoting Rowe v. Dror, 112 F.3d 473, 478 (Fed. Cir. 1997)).  Defendants rely on Eaton Corp. v. Rockwell International Corp., 323 F.3d 1332 (Fed. Cir. 2003), but that case is easily distinguished.  There, the Federal Circuit found the preamble to be a claim limitation where the claim referred to "said vehicle master clutch" and "said drive train" – which appeared only in the preamble – and the court noted that "the method steps of [the claim at issue] thus require the manipulation of particular structures that are identified and described only by the preamble, during a particular sequence of events defined only by the preamble."  323 F.3d at 1340.  There are no such antecedent references in the Neville Patent claims at issue here, and reference to the preambles is not necessary to an understanding of the claims as in Eaton.

Additionally, the prosecution history does not, as alleged by Defendants, evidence reliance on "direct routing" in the preamble as a basis for distinguishing these database

construction claims from prior art.  The prosecution history excerpt cited by Defendants perhaps evidences emphasis on the fact that the patents' direct routing methods rely on a preexisting database rather than online calculations, but it does not indicate the converse – that the database construction method described in the body must be used for direct routing.  Instead, "direct routing" in these preambles merely describes the intended use of the database construction method described in the body, and thus "direct routing" does not limit these two claims.

### III.  Conclusion

In accordance with the foregoing, the constructions of patent claim terms in the *Markman* Order (Doc. 152) are modified to the extent set forth herein.

**DONE** and **ORDERED** in Orlando, Florida this 27th day of May, 2005.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
United States Magistrate Judge David A. Baker