**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**800 ADEPT, INC.,**

        **Plaintiff,**

**-vs-**

**MUREX SECURITIES, LTD., MUREX LICENSING CORPORATION, TARGUS INFORMATION CORPORATION, and WEST CORPORATION,**

        **Defendants.**
_____

**MUREX SECURITIES, LTD., MUREX LICENSING CORPORATION, TARGUS INFORMATION CORPORATION, and WEST CORPORATION,**

        **Counter-Plaintiffs,**

**-vs-**                                **Case No.  6:02-cv-1354-Orl-28DAB**

**800 Adept, Inc.,**

        **Counter-Defendant.**
_____

**MUREX SECURITIES, LTD., and MUREX LICENSING CORPORATION,**

        **Third-Party Plaintiffs,**

**-vs-**

**Adeptel, Inc.,**

        **Third-Party Defendant.**
_____

# ORDER

This case comes before the Court on the following:

1.      *Markman* Motion of Targus Information Corporation, Murex Securities, Ltd., Murex Licensing Corporation, and West Corporation (collectively "Defendants") (Doc. No. 240, filed May 19, 2006);

2.      Opposition To Defendant's *Markman* Motion of Plaintiff 800 Adept, Inc. (Doc. No. 268, filed June 19, 2006);

3.      Combined Motion And Memorandum To Strike 800 Adept's *Markman* Opposition As Untimely Or, Alternatively, For Leave To Reply of Defendants (Doc. No. 291, filed July 3, 2006); and

4.      Opposition To Combined Motion To Strike *Markman* Opposition And Motion For Leave To Reply of Plaintiff 800 Adept, Inc. (Doc. No. 303, filed July 17, 2006).

In this patent infringement lawsuit, Targus Information Corporation, Murex Securities, Ltd., Murex Licensing Corporation, and West Corporation (collectively "Defendants") ask the Court to interpret several terms from the claims of U.S. Patent Numbers RE36,111 ("the '111 Reissue") and 5,805,689 ("the '689 Patent") and one term from the claims of the Shaffer-Moore Patents that are identified in the margin.[1] (Doc. No. 240).

First, Defendants move the Court to Strike the Opposition of Plaintiff 800 Adept, Inc. (hereinafter, "800 Adept") because 800 Adept did not file a *Markman* Motion seeking to

---

[1] The Shaffer-Moore Patents, as identified in the Declaration of Michael M. Barry, are U.S. Patent Numbers 5,506,897 ("the '897 Patent"), 5,848,131 ("the '131 Patent"), 5,901,214 ("the '214 Patent"), 5,907,608 ("the '608 Patent"), 5,910,982 ("the '982 Patent"), 5,956,397 ("the '397 Patent"), 5,982,868 ("the '868 Patent"), 6,058,179 ("the '179 Patent"), and 6,091,810 ("the '810 Patent"). (*See* Doc. No. 240, Ex. FF; Doc. No. 31, pp. 12-13). The claims of the '868 Patent do not recite the disputed claim term.

construe the claims of the '111 Reissue and '689 Patent and because 800 Adept raised new arguments in its Opposition regarding the proper construction of Defendant's disputed claim terms. (Doc. No. 291). Defendant's Motion to Strike and the issued raised therein are without merit, as an opposition to a motion is expressly allowed by the Court's Amended Case Management and Scheduling Order. (Doc. No. 182, Part II.E, p. 5). Moreover, a reply is not necessary for the arguments raised by 800 Adept in its Opposition.

Secondly, Plaintiff's argument that this motion is barred by the law of the case doctrine is not well-founded. (See Doc. No. 268, p. 15). The law of the case doctrine applies to only those issues discussed and decided by previous decisions and those issues decided in such decisions by necessary implication. *Toro Co. v. White Consol. Indus., Inc.*, 383 F.3d 1326, 1335 (Fed. Cir. 2004).  Defendants now seek a judicial determination of the meaning of a claim term, "assigning," which is a separate and distinct claim term from the one that was previously construed, "directly routing." The Court must "must give each claim term the respect that it is due," *Pause Tech., LLC v. TiVo, Inc.*, 419 F.3d 1326, 1334 (Fed. Cir. 2005), or, in other words, the Court should endeavor to give meaning to all the terms of a claim. *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005).

Moreover, the issues raised in Defendants' motion were not necessarily decided by implication in the District Court's previous *Markman* Order. In that Order, the Court addressed whether the claim term "direct routing" prohibited caller input. (Doc. No. 178, p. 38). Further, the Court's determination that the preambles of claim 41 of the '111 Reissue and claim 1 of the '689 Patent did not contain a "direct routing" limitation did not decide, either expressly or impliedly, whether those claims assigned callers prior to the placement of a telephone call.

-3-

In addition, the Magistrate Judge and previous District Court Judge declined to address the litigants' arguments concerning the "assigning" limitation and instead considered the merits of the "direct routing" limitation. (*See* Doc. No. 252, p. 19; Doc. No. 178, p. 34). Where previous decisions decline to consider an issue, the law of the case doctrine does not operate to bar the future consideration of such issue. *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 952-53 (Fed. Cir. 1997) (applying the precedent of the Court of Appeals for the Eleventh Circuit).

The Court now turns to the task of construing the claims.

## Claim Construction

Patent claims are construed by the Court as a matter of law. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454-56 (Fed. Cir. 1998) (en banc). "[T]he words of a claim 'are generally given their ordinary and customary meaning.' " *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Such ordinary meaning "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313.

To determine the ordinary meaning of a term, the court should review "the same resources as would" the person of ordinary skill in the art. *Multiform Dessicants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998). Those resources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).

-4-

"[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Both "the context in which a term is used in the asserted claim" and the "[o]ther claims of the patent in question" are useful for understanding the ordinary meaning. *Id.*

"[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.' " *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582). In short, the claims "must be read in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc). Thus, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998); *see also On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1344 (Fed. Cir. 2006) ("[E]ach term must be construed to implement the invention described in the specification").

Occasionally, "the specification may reveal a special definition given to a claim term . . . that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). The specification may also "reveal an intentional disclaimer, or disavowal, of claim scope by the inventor . . . [, which] is regarded as dispositive." *Id.* (citing *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001)).

In addition to consulting the specification, courts "should also consider the patent's prosecution history, if it is in evidence." *Id.* at 1317 (internal quotation marks and citation

omitted). Because the prosecution history represents negotiation between the United States Patent and Trademark Office (the "Patent Office") and the applicant, "it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* Nevertheless, the prosecution history can be helpful "by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution." *Id.*

The court may also rely on extrinsic evidence, which is "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language." ' *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)). Technical dictionaries and treatises can inform the Court's understanding of the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony can aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is not unhelpful. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

During claim construction, "[t]he sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate

weight to be assigned to those sources in light of the statutes and policies that inform patent law." *Phillips*, 415 F.3d at 1324.

In addition, the '111 Reissue and the '689 Patent contain means-plus-function limitations that require construction. Such limitations are subject to Title 35 U.S.C. § 112, ¶ 6. *Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). In relevant part, Section 112, ¶ 6 mandates that "such a claim limitation 'be construed to cover the corresponding structure . . . described in the specification and equivalents thereof.' " *Id.* Accordingly, when faced with means-plus-function limitations, courts "must turn to the written description of the patent to find the structure that corresponds to the means recited in the [limitations]." *Id.*

Construing a means-plus-function limitation involves multiple steps. "The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). Once the Court has determined the limitation's function, "the next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Id.* A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* Moreover, the focus of the "corresponding structure" inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.*

## The '111 Reissue and '689 Patent Claims

Defendants contend that each of theses patents contains claims having the following limitation:

> assigning to . . . said potential first parties a telephone number of a service location of a second party.

(Doc. No. 240, p. 1). Defendants aver that this limitation of the '111 Reissue and the '689 Patent "require[s] that all potential first parties be assigned to a telephone number of a service location of a second party by defining the boundaries of various service location trade areas." (*Id.* at 4, quotations and modifications omitted). Consequently, Defendants conclude that the claims require that each and every potential caller be assigned to a service location *before* any call is made, and therefore any system that uses calculations to select a service location *after* a call is made is excluded from the claimed invention. (*Id.* at 5). 800 Adept argues in response that Defendants improperly construe the claims without reference to the specific claim language. (Doc. No. 268, p. 2).

The Court first identifies the language of each claim the parties wish to construe. The '111 Reissue contains five independent claims that contain similar assigning claim limitations or method steps. Claims 1, 9, 17, 29 and 41, as amended by the reissue patent, are set forth below.

> 1. A system for direct routing a telephone call from a first party who has an originating telephone number at a specific location defined by latitude and longitude coordinates who dials a telephone number including digits uniquely characteristic to a second party having a plurality of service locations, said system comprising:
>
>> means for allocating individual latitude and longitude coordinates to each originating telephone number of all potential first parties;

means for defining the boundaries of one or more geographical areas which can be of any size and shape according to predetermined criteria, each point along said boundaries being defined by latitude and longitude coordinates;

means for <u>assigning to each originating telephone number of said potential first parties a telephone number of a service location of a second party that will receive calls originating from within the boundary of a geographic area defined by said means for defining in which the individual latitude and longitude coordinates of the specific location of each of said potential first parties lie;</u>

means for determining the originating telephone number of the first party from which said telephone call is to be routed; and

direct routing means for direct routing said telephone call to a service location of the second party assigned to said originating telephone number of the first party by said means for assigning.

9. A method for direct routing a telephone call from a first party who has an originating telephone number at a specific location defined by latitude and longitude coordinates who dials a telephone number including digits uniquely characteristic to a second party having a plurality of service locations, said method comprising the steps of:

allocating individual latitude and longitude coordinates to each originating telephone number of all potential first parties;

defining the boundaries of one or more geographical areas which can be of any size and shape according to predetermined criteria, each point along said boundaries being defined by latitude and longitude coordinates;

<u>assigning to each originating telephone number of said potential first parties [a telephone number] of a service [] location of a second party that [will[2]] receive calls originating from within the</u>

---

[2] Claim 9 of the '111 Reissue contains three printing errors. The claim recites the word "parties" in between "service location" and omits the terms "a telephone number" and "will." The published claim differs from the claim language recited in the claims allowed by the Patent Office and submitted by the applicant. (*See* Doc. No. 240, Ex. C, p. 235). The

<u>boundary of a geographic area defined in said step of defining in which the individual latitude and longitude coordinates of the specific location of each of said potential first parties lie;</u>

determining the originating telephone number of the first party from which said telephone call is to be routed; and

directly routing said telephone call to a service location of the second party assigned to said originating telephone number of the first party by said step of assigning.

17. A system for direct routing a telephone call from a first party who has an originating telephone number at a physical location and who dials a telephone number including digits uniquely characteristic to a second party having a plurality of service locations, said system comprising:

means for allocating latitude and longitude coordinates to the physical location of all potential first parties;

means for defining the boundaries of one or more geographical areas which can be of any size and shape according to predetermined criteria, each point along said boundaries being defined by latitude and longitude coordinates;

means for <u>assigning to the physical location of said potential first parties a telephone number of a service location of a second party that will receive calls originating from within the boundary of a geographic area in which the latitude and longitude coordinates of the physical location of each of said potential first parties lie;</u>

means for determining the originating telephone number of the first party from which said telephone call is to be routed; and

direct routing means for directly routing said telephone call to a service location of the second party assigned to said

---

record does not contain any evidence that a certificate of correction has issued for this patent. The Court finds that these are clear clerical errors due to oversight that are not subject to reasonable debate and construes the claim as if it were properly published. *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1354 (Fed. Cir. 2003) (quoting *I.T.S. Rubber Co. v. Essex Rubber Co.*, 272 U.S. 429 (1926)). The claim language in this Order incorporates the changes of the Reissue.

originating telephone number of the first party by said means for assigning.

29. A method for direct routing a telephone call from a first party who has an originating telephone number at a physical location and who dials a telephone number including digits uniquely characteristic to a second party having a plurality of service locations, said method comprising the steps of:

allocating latitude and longitude coordinates to the physical location of all potential first parties;

defining the boundaries of one or more geographical areas which can be of any size and shape according to predetermined criteria, each point along said boundaries being defined by latitude and longitude coordinates;

assigning to the physical location of said potential first parties a telephone number of a service location of a second party that will receive calls originating from within the boundary of a geographic area in which the latitude and longitude coordinates of the physical location of each of said potential first parties lie;

determining the originating telephone number of the first party from which said telephone call is to be routed; and

directly routing said telephone call to a service location of the second party assigned to said originating telephone number of the first party by said step of assigning.

41. A method of constructing a database wherein said database is used by a telephone service provider for direct routing a telephone call from a first party who has an originating telephone number at a physical location and who dials one of an 800-type, 900-type or other special access code telephone number assigned to a second party, who has determined specific locations to receive calls originating from within pre-determined geographic areas, thereby allowing the first party to reach one of a plurality of locations of the second party based on geographic location from which the telephone call originate from within one of a plurality of geographic areas, said method comprising the steps of:

(a)    assigning individual latitude and longitude coordinates to the physical location of all potential first parties;

Case 6:02-cv-01354-MSS-DAB   Document 330   Filed 08/03/06   Page 12 of 28 PageID 9524

(b)    defining the boundaries of one or more geographic areas which can be of any size and shape according to predetermined criteria each point along said boundaries being defined by latitude and longitude coordinates; and

(c)    <u>assigning to the physical location of said potential first parties a telephone number of a service location of a second party that will receive calls originating from within the boundary of a geographic territory in which the latitude and longitude coordinates of the physical location of each of said potential first parties lies</u>.

('111 Reissue, col. 13, ll. 2-30; col 13. l. 51 to col. 14, l. 11; col. 14., ll. 32-57; col. 15, ll. 19-

44; col. 16, ll. 7-34, emphasis added). The '689 Patent issued with a single independent

claim. Claim 1 recites:

1. In a telephone system, a method of constructing a database wherein said database is used by a telephone service provider for direct routing a telephone call from a first party who dials one of an 800-type, 900-type or other special access code telephone number assigned to a second party, who has determined specific locations to receive calls originating from within pre-determined geographic areas, thereby allowing the first party to reach one of a plurality of locations of the second party based on geographic location of the first party from within one of a plurality of geographic areas, said method comprising the steps of:

a.    assigning individual latitude and longitude coordinates to each telephone number of all potential first parties;

b.    defining the boundaries of one or more geographic areas which can be of any size and shape according to pre-determined criteria;

c.    <u>assigning to the telephone number of each potential first party a telephone number of a specific location of the second party that will receive calls originating from within a geographic area of each first party</u>;

d.    determining in which geographic area a potential call might originate for each potential first party in the area encompassed by all geographic areas; and

-12-

e.   assigning the specific location of the second party to all potential first parties within the boundaries of each geographic area.

('689 Patent, col. 12, l. 64 to col. 13, l. 23, emphasis added). The Court addresses the construction of claims 1 and 17 of the '111 Reissue separately below because each of these claims recites the assigning limitation in mean-plus-function format.

Both parties treat the underlined assigning steps in claims 9, 17, 29, and 41 of the '111 Reissue and claim 1 of the '689 Patent as substantially the same; the Court does not. Further, Defendants' truncation of the assigning step improperly omits claim terms. In each claim, the object of the gerund "assigning" is not "to . . . said first parties" but "to each originating telephone number of said potential first parties" or "to the physical location of said potential first parties" or "to the telephone number of each potential first party." Because the Court must "must give each claim term the respect that it is due," it would be inappropriate to ignore the underlined terms. *Pause Tech., LLC*, 419 F.3d at 1334.

Nevertheless, the claims are substantially similar in that they each call for an assignment, and each claim recites "potential first parties" or "potential first party." This Order addresses the latter claim limitations first. Then, the Court will construe the meaning of the "assigning" limitation.

### *"Potential First Parties"*

Defendants argue that the term "first parties" should be understood as referring to a caller or a person who is making a telephone call. (Doc. No. 240, p. 4). Defendants also assert that the term "potential," which allegedly modifies the term "first parties" in every claim, means the "first parties" are not actual callers, i.e., a person who has made or is making a call, but rather a person who may make a telephone call. (*Id.*). 800 Adept

contends that "potential first parties" should be construed as "those parties who can be assigned latitude and longitude coordinates and can also be assigned to a destination according to the second parties' criteria." (Doc. No. 268, p. 9).

Each of the independent claims of these two patents provides the context in which to construe "first parties." The preambles of claims 1, 9, 17, 29 and 41 of the '111 Reissue all recite "a telephone call from a first party who has an originating telephone number," and the preamble of claim 1 of the '689 Patent recites "a telephone call from a first party who dials one of an 800-type, 900-type or other special access code telephone number." This is not to say that the preambles act as a limitation of the claims, but such language places the claim term in a context that is absent from the rest of the claim. Thus, the claimed "first parties" are colloquially "callers" or "individuals who place telephone calls."

It is also clear from the specification that the term "first parties" must refer to callers. The written description describes "a system for automatic direct routing of telephone calls from customers" ('111 Reissue, col. 1, ll. 19-20) designed to reduce the amount of computer interaction by "causing the call to be direct-routed" (*id.* at col. 2, l. 7). It also states that a prior art patent "requires that the caller dial from a 'touch-tone' phone." (*Id.* at col 2, ll. 19-20). Under the heading "Summary of the Invention," the patent discloses that the "primary object of the present invention is to provide a reliable and cost-effective manner of directly connecting callers interested in an advertiser's product. . . ." (*Id.* at col. 3, ll. 10-12). The abstracts and specifications repeatedly and consistently refer to "calls" and "callers" but fail even once to use the term "first parties" except in the claims. (*See id. passim*). Put simply, the terms call and caller are used throughout both patent specifications, and "first parties" is not. (*See id.* at face page).

-14-

Defendants offer two definitions for "potential" from internet dictionaries which do not differ substantively from the definition found in the bound dictionaries available to the Court. (*See* Doc. No. 240, p. 4 n.6). Defendants' definitions are "existing in possibility" and "capable of development into actuality." (*See id.*). Plaintiffs do not offer any dictionary definition for the term. <u>Webster's II New Riverside University Dictionary</u> defines potential as "1. Capable of being but not yet in existence. 2. Denoting possibility, capability, or power." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 920 (1994). The Court of Appeals for the Federal Circuit permits the use of general purpose dictionaries in cases that involve commonly understood words having widely accepted meanings. *Phillips*, 415 F.3d at 1314. Such is the case here.

The ordinary meaning of "potential" is also consistent with the use of the term in the specification. The term "potential" is found only within the abstract and claims of each patent. The abstracts are identical:

> A method and system for direct routing of telephone calls made by a caller originating from within specific calling areas to one of a plurality of locations of a second party according to certain criteria established by the second party. This routing is accomplished based on the assignment of latitude and longitude coordinates to <u>a potential caller's</u> location. Once these coordinates are assigned to each of <u>the potential callers</u>, the second party's criteria is applied to assign <u>the potential caller</u> to a second party. Such criteria could be existence within a previously-defined geographic area, a custom defined geographic area, or through calculations such as the shortest distance between coordinate points. Once all such assignments have been made, a database is assembled to be used by a long distance carrier for direct routing of telephone calls from callers to an assigned second party.

(*Id.* at face page, emphasis added). Such disclosure does not add much of substance other than indicating the term is used as one would expect, and that the written description of the

-15-

patents does not "reveal a special definition . . . that differs from the meaning [that the term] would otherwise possess." *Phillips*, 415 F.3d at 1316.

Here, the adjective, "potential," modifies the meaning of the noun "parties" which has already been modified by the adjective "first." That is, the meaning of "potential first parties" is a specialized meaning of the broader term "first parties." As discussed above, the term "first parties" refers to a universe of callers or individuals who place telephone calls, and the adjective "potential" narrows that universe of individuals to those having the capability of placing a telephone call but who have not done so. Consequently, the Court construes the term "potential first parties" to mean "individuals who can place a telephone call but have not yet done so."

### *"Assigning"*

Defendants contend that the term "assigning" means to specify, select, or designate or to "fix in correspondence or relationship." (Doc. No. 240, p. 4 n.8). Defendants argue that the patent abstracts and figures demonstrate further that such assignment must be accomplished before a caller places a telephone call and that such assignment must be stored in a single look-up table. (*Id.* at 5-8). Defendants also identify portions of the prosecution history that allegedly show a disclaimer of spacial calculations made after a caller has placed a call and a disclaimer of database structures other than a single look-up table. (*Id.* at 8-15). In addition, Defendants contend that the Examiner's statements concerning the scope of the disclosure of the '111 Reissue in an unrelated reexamination proceeding supports the conclusion that the claims of the '111 Reissue are limited to single look-up tables. (*Id.* at 16). The state of the art at the time of the filing of the patent applications, argue Defendants, also supports the limitation of "assigning" to that of a single

look-up table. (*Id.* at 16-18). Lastly, Defendants assert that because Plaintiff omitted any reference to spacial calculations made during a call in an interrogatory response, such omission is evidence of a disclaimer of such calculations. (*Id.* at 18-19).

800 Adept contends that the abstract, figures and other parts of the patents' specifications do not limit the claimed inventions to a single look-up table. (Doc. No. 268, pp. 3-5, 6-8). On the contrary, argues Plaintiff, the specifications specifically recite multiple embodiments, including relational or hierarchical database structures. (*Id.* at 4). 800 Adept also criticizes Defendants' reliance on statements made in an unrelated reexamination proceeding by the Examiner concerning the scope of the disclosure of the '111 Reissue. (*Id.* at 5-6).

Returning to the languages of the claims, Plaintiff asserts that the plain meaning of the term "assign" is not limited to any one methodology. (*Id.* at 8). 800 Adept avers that every database query is the equivalent of a mathematic calculation, and therefore the database embodiments disclosed in the specifications do require "calculations" to be made after a telephone call is placed by a caller. (*Id.* at 10-11). Moreover, Plaintiff argues that there is no way in which to perform the "assign" limitation to a caller using a mobile telephone prior to the actual telephone call. (*Id.* at 11-13). Lastly, Plaintiff argues that the passages from the prosecution history identified by Defendants do not address the "assigning" limitation of the claims and, in any event, do not disclaim calculations made during a telephone call. (*Id.* at 14).[3]

---

[3] Plaintiff also presents an argument which relies on a portion of the Magistrate's *Markman* Order which was not adopted by the Court. (See Doc. No. 178, p. 39). Such reliance is misplaced. In addition, Plaintiff improperly attempts to incorporate by reference arguments presented in other documents. (*See* Doc. No. 268, p. 16). This practice is

Based on the above, it is apparent that there are two general disagreements over the construction of this claim term. First, the parties debate whether the claims of the '111 Reissue and '689 Patent are limited to a single look-up table, or in other words whether the applicants disclaimed all embodiments except for a database containing a single table. Secondly, the parties dispute whether the assigning limitation disclaims calculations made during the telephone call.

As to the first issue, the Plaintiff plainly has the better argument. The claims, specification and prosecution history of the '111 Reissue and '689 Patent do not limit the term "assigning" to a single, static look-up table. The claims do not recite the term table; they recite the term database. The specification teaches that the database contains fields which can be used as natural keys and that the database structure may be relational or hierarchal. ('111 Reissue, col. 9, ll. 48-51). Thus, the specification plainly teaches database structures as alternatives to a single table database. Moreover, it is well settled that "the scope of the claims is not limited to particular embodiments depicted in the figures." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1365 (Fed. Cir. 2004). Therefore, without more, Defendants' arguments concerning Figure 1 from the patents is without merit.

Moreover, the passages selected from the patents' prosecution history do not clearly and unambiguously disclaim alternative database structures. *See Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375, 1378-79 (Fed. Cir. 2005) ("Disclaimers based on disavowing actions or statements during prosecution . . . must be both clear and unmistakable."). In

---

prohibited by Local Rule 3.01(b) which limits a response to a document to not more than twenty (20) pages.

each passage quoted from the prosecution history, applicants speak of a "database," not a table or a single look-up table. (*See* Doc. No. 240, pp. 10-11, 13).

Lastly, the Court finds no reason to limit the claims to a single look-up table from the statements of the Patent Office Examiner. First, "it is the applicant, not the examiner, who must give up or disclaim subject matter that would otherwise fall within the scope of the claims." *Sorensen*, 427 F.3d at 1379 (quoting *Innova/Pure Water, Inc.*, 381 F.3d at 1124). Secondly, the Examiner's statements in the '111 Reissue do not refer to a look-up table but rather to the database of the claimed invention. It is of no moment that the Examiner refers to the embodiment depicted in Figure 1. That argument has no more force in this context than when the Court construes the claims. *See Lighting World, Inc.*, 382 F.3d at 1365 ("[T]he scope of the claims is not limited to particular embodiments depicted in the figures."). Further, although the Examiner characterizes the '111 Reissue in an unrelated reexamination proceeding as implementing "a telephone number to telephone number lookup in a single table, or database," it is clear from the context of the statement that the Examiner was discussing the patent's <u>disclosure</u>, i.e., what the '111 Reissue teaches and not the scope of the claimed invention. (*See* Doc. No. 240, p. 16 n.33 & n.34). "Specifications teach. Claims claim." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985).

The parties also dispute whether the assigning limitation disclaims calculations made during the telephone call, and both parties delve into the prosecution history and state of the art to support their positions. The Court addresses this dispute in two parts. First, the Court must determine when the "assigning" step occurs. Then, the Court determines whether there is a disclaimer of the scope of the claims.

The answer to the first question starts with the language of the claims. The claims of the '111 Reissue recite "assigning to [each originating telephone number[4] *or* the physical location[5]] of said potential first parties a telephone number of a service location of a second party that will receive calls originating from within the boundary of a geographic area." Similarly, claim 1 of the '689 Patent recites "assigning to the telephone number of each potential first party a telephone number of a specific location of the second party that will receive calls originating from within a geographic area of each first party."

"Assigning" is a commonly used and widely understood word. *See Phillips*, 415 F.3d at 1314. It means "to set aside for a particular purpose" or "designate." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 131 (1994). It is clear upon review of the specification that the patent uses the term in a manner consistent with its ordinary meaning without providing a more specialized meaning. *See Philips*, 415 F.3d at 1366.

As discussed above, the term "potential first parties" refers to individuals who can place a telephone call but have not done so. The use of the term "potential first parties" strongly suggests that the assignment occurs prior to the caller placing a telephone call. In addition, each and every one of the claims uses the future tense, i.e., "the second party that *will receive* calls." The use of the future tense in the claims also suggests that the event described by the verb, i.e., the call, has not happened yet.

A review of the specification also supports the conclusion that the assignment occurs prior to the placement of the telephone call. The '111 Reissue teaches that once a

---

[4] This is the language used in claim 1 and claim 9 of the '111 Reissue.

[5] This language is used in claim 17, claim 29, and claim 41 of the '111 Reissue.

telephone call has been placed by an individual, a local exchange carrier contacts a long distance carrier ("LDC") for routing instructions. ('111 Reissue, col. 4, l. 60 to col. 5, l. 20). The LDC retrieves the routing instructions from its own network control point ("NCP") and passes those instructions back to the local exchange carrier. (*Id.*). The specification teaches that the NCP contains "all of the direct routing instructions for the WATS number." (*Id.*; *see also id.*, col. 5, ll. 24-51; *id.*, col. 5, ll. 45-53; *id.*, col. 8, ll. 14-22; *id.*, col. 8, ll. 39-48; *id.*, col. 8, l. 64 to col. 9, l. 6; *id.*, col. 9, ll. 23-32).

The specification also teaches the steps required to prepare the NPC for its role in this system. The written description discloses that "*[a]fter* defining the trade areas, *assigning* the corresponding NPA-NXX (or NPA-NXX-XXXX) combinations and submitting the appropriate direct routing information to the chosen LDC, the system (network) is activated." (*Id.*, col. 12, ll. 38-41, emphasis added). In other words, the LDC does not receive the routing instructions that are stored in the NCP until *after* the assignment step is complete.

The abstract also supports this claim construction. It discloses:

> Once these coordinates are assigned to each of the potential callers, the second party's criteria is applied to assign the potential caller to a second party. . . . Once all such assignments have been made, a database is assembled to be used by a long distance carrier for direct routing of telephone calls from callers to an assigned second party.

(*Id.* at face page, emphasis added).

Consequently, the language of the claims when read in light of the specification refers to "a designation made prior to the telephone call of the first parties."

The Court also considers whether the applicant disclaimed calculations made after the telephone call. Nothing in the above analysis indicates that the applicant must have

-21-

disclaimed further calculations. Indeed, the specification contemplates further processing where the call is placed from a mobile telephone.[6] (*Id.*, col. 6, l. 59 to col. 7, l. 2).

Additionally, the prosecution history does not expressly and unambiguously disclaim all calculations made after a telephone call is placed. In distinguishing a prior art reference, the applicant stated:

> A second major distinction between Finucane, *et al.* patent and Applicant's system is that Finucane, *et al.* requires that a computer perform "point of origin" to "point of termination" calculations while the caller is on the line . . . .
>
> On the other hand, Applicant's Direct Routing Telephone System performs all such calculations prior to the call even being made and, in fact, prior to the delivery of the data base [sic] to the Long Distance Carrier (LDC).

(Doc. No. 240, Ex. C, pp. 123). Similar statements are quoted by Defendants on pages 9 to 13 of docket number 240. These statements are, at best, ambiguous. They might refer to the timing of the "assigning" step or they might refer to the disclaimer of post telephone call calculations. The Court finds the former is the better view in light of the disclosure of the specification as a whole. In any event, such ambiguity prevents the applicant's statements in the prosecution history from serving as a disclaimer of claim scope.

### Means-Plus-Function Limitations

Neither party offers the Court an argument concerning the means-plus-function limitations recited in claim 1 and claim 17 of the '111 Reissue. In order to construe these claims, the Court must identify the function of the limitation and then determine the corresponding structure disclosed in the specification. *Medtronic, Inc.*, 248 F.3d at 1311.

---

[6] Plaintiff's argument concerning the "cell phone embodiments" supports only the proposition that further calculations were contemplated once the technology was available.

In addition, the Court must identify whether the corresponding structure is clearly linked or associated with the recited function. *Id.*

The Court grants leave to each party to submit one five (5) page memorandum on this issue. The memorandum shall (1) identify the function, (2) identify the corresponding structure disclosed in the specification, and (3) identify whether the corresponding structure is clearly linked or associated with the recited function.

### The Shaffer-Moore Patents

The parties also dispute the meaning of the term "spatial key" which appears in the claims of nearly all of the Shaffer-Moore Patents. Defendants' proposed definition is "a single number that identifies a small, specific geographically defined area, line, or point that is defined by a set or sets of coordinates." (Doc. No. 240, pp. 19-20). In support of this definition, Defendants point to the use of the term in the specification of the patents and to the construction given to this term by the United States District Court for the Eastern District of Virginia. (*Id.*).

800 Adept argues that "spacial key" should be construed as that term was defined in the Shaffer-Moore Patents. (Doc. No. 268, pp. 17-20). Plaintiff contends that it would be inappropriate to insert "small" in the definition of this term because (1) the specification does not limit spacial keys to "small" geographic areas but merely calls these "preferred" or "unique," (2) "small" adds nothing to the definition because it is a relative term, and (3) the ruling of the District Court of the Eastern District of Virginia is not binding on this Court. (*Id.*).

Although the Court recognizes that a uniform treatment of claim construction is desirable, the claim construction of another district court in no way binds this Court under

the instant circumstances. The parties provide only a single Order of the Court, without its reasoning, discussion of the arguments of the parties, or reference to the underlying facts. The claim construction of the Virginia District Court was not appealed to the Federal Circuit. Defendants do not provide any authority that would afford that Order preclusive effect. Defendants do not argue that issue preclusion, collateral estoppel, or judicial estoppel are applicable. Simply put, this Court "will render its own independent claim construction." *See Maurice Mitchell Innovations, L.P. v. Intel Corp.*, 2006 WL 1751779, *4 (E.D. Tex. 2006).

The Court construes "spacial key" as that term is taught in the specification of the '897 Patent. It is defined there as:

> The spacial key is a single number that identifies a specific geographically defined area, line, or point that is defined by a set of coordinates.

('897 Patent, col. 9, ll. 39-42). The specification discloses that the spacial key can be "a coded version of the coordinate description of" "simple geographies like points and rectangles." (*Id.*, col. 9, ll. 43-45). Further, the specification teaches:

> The postal zip+4 code is the preferred spacial key used to link the master table to the client table, but there are other small geographic areas capable of having unique spacial keys, such as zip+6 code areas, census blocks, or very small latitude/longitude grids, tiles, windows, or quad-trees.

(*Id.*, col. 9, ll. 46-50). Except for this single reference, the figures, tables, and disclosure of the specification only disclose the use of a zip+4 code as a spacial key. (*See id.*, col. 11, l.  45 to col. 12, l. 12; *id.*, col. 12, ll. 40-50; *id.*, col. 13, ll. 8-30; *id.*, col. 17, ll. 29-33; *id.*, col. 21, ll. 38-40; *id.*, col. 24, ll. 13-16; *id.*, col. 24, ll. 30-34).

The specification also characterizes the operation of prior routing systems and their problems. Prior art systems, the applicants note, "are very coarse in their level of precision and cannot handle small service areas with legally defined franchise territories like pizza

delivery." (*Id.*, col. 3, ll. 35-37). Another problem with prior art routing systems "is that they divide the United States into many large arbitrarily defined areas and there is no ability to route a call to the closest service location if the closest location is not located in the same artificially created area as the caller." (*Id.*, col. 3, ll. 48-52). Moreover, the specification teaches that the desired system should "not use artificially created areas such as telephone wire centers, telephone prefixes, or 5-digit zip codes where calls can only be routed within their area." (*Id.*, col. 3, ll. 56-59). The specification also characterizes U.S. Postal Service zip+4 codes as "small geographic areas" and the first six digits of the Automatic Number Identification system as designating a "fairly large" area. (*Id.*, col. 4, ll. 53-56; *id.*, col. 4, ll. 64-67).

Accordingly, two strands wind through the disclosure of the Shaffer-Moore Patents. On the one hand, the Shaffer-Moore Patents teach that a spacial key is a single number that identifies a specific geographic area. The size of the geographic area is omitted; it is the specificity or "uniqueness" of the area that is important. On the other hand, the specification also systematically discloses the advantages of choosing "small" geographic areas to use a spacial keys. In particular, the use of telephone exchange numbers and five-digit zip codes is disparaged while the use of zip+4 and similarly-sized or smaller geographic areas is touted. Nevertheless, there is no explicit or manifest disclaimer in the specification requiring that spacial keys must be small, specific geographically-defined areas.

The Federal Circuit instructs courts that "the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v.*

*Medrad, Inc.*, 358 F.3d 898, 907-08 (Fed. Cir. 2004) (quotation omitted). Last year, the Federal Circuit followed this maxim in *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005).

In that case, the patent-in-suit claimed a wet-shave safety razor with multiple blades. *Id.* at 1369. Specifically, the patent claimed a "safety razor comprising . . . a group of first, second, and third blades," but the defendant manufactured a four-blade safety razor. *Id.* After reviewing the patent specification, the District Court limited the scope of the claim to a razor having solely three-blades. *Id.* On appeal, the Federal Circuit reversed this claim construction. *Id.* at 1374.

After discussing the use of open language in the claim, the Court focused on the patent's written description. *Id.* at 1373. The specification, noted the Court, first characterized the scope of the invention broadly when it taught that the invention relates to safety razors having blade units with a plurality of blades. *Id.* The Court then emphasized that although the specification makes numerous references to a preferred embodiment with three blades, such "narrower embodiment does not impose a limit on the broader claim language as elucidated by the reference to 'the invention' as embracing a 'plurality of blades.' " *Id.* at 1374. Additionally, despite the numerous cites to three-bladed razors plucked from the written description, the Court noted that "no statement in the patent surrenders or excludes a four-bladed razor." *Id.*

The written description of the Shaffer-Moore Patents is similar to the written description at issue in *Gillette*. In each case, the written description broadly defines a claim term but nonetheless provides a disclosure of examples of limited scope. As in *Gillette*, this

Court will construe the term broadly because there is no explicit or manifest disclaimer of claim scope in the Shaffer-Moore Patents.

Accordingly, the Court construes "spacial key" to mean "a single number that identifies a specific geographically defined area, line, or point that is defined by a set of coordinates."

### Conclusion

Based on the foregoing, the Court **GRANTS** Defendants' Markman Motion (Doc. No. 240) and rules as follows:

1.   As recited in the '111 Reissue and the '689 Patent, the term "potential first parties" refers to "individuals who can place a telephone call but have not yet done so";

2.   As recited in the '111 Reissue and the '689 Patent, the term "assigning" refers to "a designation made prior to the telephone call of the first parties";

3.   As recited in the Shaffer-Moore Patents, the term "spacial key" refers to "a single number that identifies a specific geographically defined area, line, or point that is defined by a set of coordinates"; and

4.   The parties shall within five (5) days of the date of this Order file with the Court a memorandum addressing the means-plus-function claims of the '111 Reissue. The memorandum of each party shall be no more than five (5) pages in length and shall (1) identify the function, (2) identify the corresponding structure disclosed in the specification, and (3) identify whether the corresponding structure is clearly linked or associated with the

recited function. The opposing party may then file a memorandum in opposition within ten (10) days of the date of this Order. A memorandum in opposition shall also be no more than five (5) pages in length.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on August 3__, 2006.

PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

Counsel of Record